619 S.E.2d 534 (2005)
In re J.W., A minor juvenile, DOB: 05-09-00.
In re K.W., A minor juvenile, DOB: 06-13-97.
No. COA04-1280.
Court of Appeals of North Carolina.
October 4, 2005.
E. Marshall Woodall, Lillington, for petitioner-appellee Harnett County Department of Social Services.
Elizabeth Myrick Boone, Sanford, for Guardian ad litem.
Jesse Jones, Lillington, for respondent-appellee Robert Winder.
Carlene Edwards, Lillington, for respondent-appellee Jason Wiggins.
Peter Wood, Raleigh, for respondent-appellant.
*537 HUNTER, Judge.
Respondent-mother appeals from an order terminating her parental rights over her minor children, J.W. and K.W. For the reasons stated herein, we affirm the trial court's order of termination.
Respondent is the mother of K.W. and J.W., two boys born to different fathers. K.W.'s father currently lives in Nevada and has had little contact with K.W. J.W.'s father married respondent and moved the family to North Carolina. Neither father challenges the termination of their respective parental rights.
*538 Evidence presented at the termination of parental rights hearing established that in December 2000, when J.W. was approximately seven months old and K.W. was three years old, respondent took J.W. to the hospital because of his spitting up. The hospital diagnosed J.W. with acid reflux and failure to thrive. The Harnett County Department of Social Services ("DSS") was contacted. After meeting respondent and the children at the hospital, DSS conducted a home visit which revealed unsafe and unsanitary conditions.
A nonsecure custody petition was filed alleging neglect, and both children were subsequently removed from the home. The children were adjudicated neglected in February 2001 due to J.W.'s "failure to thrive" and the unsafe and unsanitary conditions of the home. Full custody was awarded to DSS. The trial court further ordered that J.W. remain in foster care, and that K.W. be returned to the home after proper child care arrangements had been confirmed.
A review was held on 10 August 2001 and placement of J.W. in respondent's home was approved. A permanency planning meeting was held on 9 November 2001 and the children were permitted to remain in respondent's home, but with weekly DSS visits to monitor placement. On 16 January 2001, the Guardian ad Litem and Attorney Advocate filed a motion to review placement after a home visit by DSS revealed unsanitary conditions. The children were removed pending review. On 8 February 2002, the trial court continued custody of both children with DSS and ordered them placed into foster care after finding that respondent had digressed from the original compliance with the service plan, had failed to keep a clean home, and showed an apparent lack of concern for the children. The trial court ordered a dual plan for reunification and placement with other family. Additionally, the trial court ordered respondent to comply with a list of items, "in the event the parents desire to have their children returned." Twelve of the items applied to respondent:
1. Attend Parenting classes[.]
2. Participate  DSS Homemaker services[.]
. . .
4. Participate in household budgeting classes with Extension Services[.]
5. Obtain counselling [sic] and treatment as recommended by Dr. Aiello.
6. Pay child support[.]
. . .
8. Mother obtain and maintain employment with a schedule compatible with the needs of the children[.]
9. Obtain a telephone[.]
10. Attend all medical and dental appointments with children or conference with care providers to maintain familiarity with children's condition.
11. Keep and maintain a clean and appropriate home environment.
12. Provide evidence of compliance to DSS or GAL on a weekly basis[.]
13. Maintain stable residence and not have boarders or house guests for extended periods of time.
14. Sign releases for DSS and GAL to allow communication by DSS and GAL with all service providers, above.
Another permanency planning hearing was held 12 July 2002. The trial court found that while "[respondent] initially complied with the service plan, [she has] not complied fully as ordered." The trial court ordered that reunification efforts and visitation with the parents cease, and that DSS pursue guardianship with a relative. At the permanency planning hearing held 8 August 2003, the trial court found that the home study of the maternal grandmother had been completed and not approved, and ordered that the plan be changed from guardianship to adoption. A motion to terminate parental rights was filed 30 September 2003. After hearings held in February 2004, the trial court found grounds existed for termination pursuant to N.C. Gen.Stat. § 7B-1111(a)(1) and (2), and that it was in the best interests of both children to terminate the rights of respondent. Respondent appeals.

*539 I.
In her first assignment of error, respondent contends the trial court committed prejudicial error in sustaining an objection to cross-examination of Sara Messer ("Messer"), a DSS investigator. We disagree.
"The scope of cross-examination lies largely within the discretion of the trial court[.]" State v. Atkins, 304 N.C. 582, 585, 284 S.E.2d 296, 298 (1981). "Since the limit of legitimate cross-examination is a matter largely within the trial judge's discretion, his rulings thereon will not be held to be prejudicial error in absence of a showing that the verdict was improperly influenced by the ruling." State v. Edwards, 305 N.C. 378, 381-82, 289 S.E.2d 360, 363 (1982).
Here, the trial court sustained an objection to the relevancy of respondent's questioning regarding the condition of the home on the day after the initial visit by DSS, prior to the first adjudication of neglect. "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen.Stat. § 8C-1, Rule 401 (2003). Here, the issue before the court was a petition for termination of parental rights on two grounds, parental neglect pursuant to N.C. Gen.Stat. § 7B-111(a)(1), and willfully leaving the juveniles in foster care for more than twelve months without reasonable progress pursuant to section 7B-1111(a)(2).
Respondent contends that cross-examination of Messer was relevant to the determination of whether respondent's parental rights should be terminated for neglect. In In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984), our Supreme Court stated that a prior adjudication of neglect was admissible in a subsequent termination hearing, but that the "determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding." Id. As a prior adjudication of neglect is not determinative for a termination proceeding, the issue before the trial court was the independent determination of whether neglect authorizing the termination of parental rights existed at the time of the hearing. In re Byrd, 72 N.C.App. 277, 280, 324 S.E.2d 273, 276 (1985). Therefore, the trial court properly sustained the objection to respondent's cross-examination questions related to the validity of the first adjudication of neglect, as the relevant issue was not the prior adjudication of neglect, but the possibility of future neglect at the time of the termination hearing.
Further, even assuming arguendo that the trial court improperly sustained the objection to respondent's cross-examination of Messer as to the condition of the home on the day following the initial DSS visit, respondent fails to show that such error was prejudicial. Respondent cross-examined Heather Floyd ("Floyd"), the DSS worker in charge of respondent's case following the adjudication of neglect, as to respondent's housekeeping habits over the months Floyd monitored the household following the children's return to the home subsequent to the initial adjudication of neglect. Respondent also questioned Floyd as to the correction of the problems with dangerous implements which were a partial basis for the initial adjudication of neglect. Respondent, therefore, was permitted to present to the court evidence related to respondent's housekeeping habits as observed by DSS.
As the trial court properly sustained the objection to respondent's question for lack of relevancy, and as, assuming arguendo that the trial court erred, the error was not prejudicial, we find this assignment of error to be without merit.

II.
Respondent next contends that the trial court erred in admitting documents from prior hearings into evidence for a limited purpose. We disagree.
"[A] court may take judicial notice of earlier proceedings in the same cause." In re Byrd, 72 N.C.App. at 279, 324 S.E.2d at 276. Our statutes state that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably *540 be questioned." N.C. Gen.Stat. § 8C-1, Rule 201(b) (2003). As discussed supra, our Courts have held that prior adjudications of neglect are admissible, although not determinative in a parental rights proceeding. See Ballard, 311 N.C. at 715, 319 S.E.2d at 232; In re Huff, 140 N.C.App. 288, 300, 536 S.E.2d 838, 846 (2000).
Here, the trial court permitted admission of the previous order of adjudication, review orders, and permanency planning orders. Respondent objected on the grounds that review and permanency planning orders are subject to a lower standard of evidentiary proof, and therefore would admit evidence that was not clear, cogent, and convincing as required for a termination hearing. This Court recently addressed the same objection in In re J.B., ___ N.C.App. ___, ___, 616 S.E.2d 264, 273 (2005), noting that there is a "well-established supposition that the trial court in a bench trial `is presumed to have disregarded any incompetent evidence.'" Id. at ___, 616 S.E.2d at 273 (quoting Huff, 140 N.C.App. at 298, 536 S.E.2d at 845). As in J.B., nothing in the record before us indicates that the trial court failed to conduct the independent determination required when prior disposition orders have been entered in the matter. Ballard, 311 N.C. at 715-16, 319 S.E.2d at 232-33. The trial court specifically found that it had considered the testimony offered by both petitioner and respondent's witnesses at the hearing in making its determination of neglect. We, therefore, find no error in the trial court's admission of orders of prior adjudication, review, and permanency planning.

III.
Respondent next contends in related assignments of error that the trial court erred in its findings of fact and conclusions of law. We disagree.

A. Findings of Facts

In its order terminating respondent's parental rights, the trial court made fifty-seven findings of fact. Respondent alleges that portions of multiple findings of fact are not supported by clear, cogent, and convincing evidence.
We first address the applicable law and standard of review by which we are bound. "Termination of parental rights is a two-stage proceeding. At the adjudication stage the petitioner must show by clear, cogent and convincing evidence that grounds exist to terminate parental rights." In re Brim, 139 N.C.App. 733, 741, 535 S.E.2d 367, 371 (2000). "In the adjudicatory stage, the petitioner has the burden of establishing by clear and convincing evidence that at least one of the statutory grounds listed in N.C. Gen.Stat. § 7B-1111 exists." In re Anderson, 151 N.C.App. 94, 97, 564 S.E.2d 599, 602 (2002) (citation omitted).
A trial court may terminate parental rights for any of the reasons set out in N.C. Gen.Stat. § 7B-1111 (2003). N.C. Gen.Stat. § 7B-1111(a)(1) states that a court may terminate parental rights where: "The parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101." Id. "Neglect," in turn, is defined as follows:
Neglected juvenile.  A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law....
N.C. Gen.Stat. § 7B-101(15) (2003).
Section 7B-1111(a)(2) states that a trial court may terminate parental rights where the court finds that: "The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile...." Id. "`A finding of any one of the grounds enumerated [in section 7B-1111], if supported by competent evidence, is sufficient to support a termination.'" In re *541 D.J.D., ___ N.C.App. ___, ___, 615 S.E.2d 26, 32 (2005) (citation omitted).
In termination proceedings, "the trial judge acts as both judge and jury, thus resolving any conflicts in the evidence." In re Oghenekevebe, 123 N.C.App. 434, 439, 473 S.E.2d 393, 397 (1996). As explained in In re Whisnant, 71 N.C.App. 439, 322 S.E.2d 434 (1984):
This is because when a trial judge sits as "both judge and juror," as he or she does in a non-jury proceeding, it is that judge's duty to weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom.
Id. at 441, 322 S.E.2d at 435 (citation omitted). "If different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected." In re Gleisner, 141 N.C.App. 475, 480, 539 S.E.2d 362, 365-66 (2000).
On appeal, this Court reviews whether the district court's findings of fact are supported by clear, cogent and convincing evidence, and whether those findings support the district court's conclusions of law. If the decision is supported by such evidence, the district court's findings are binding on appeal, even if there is evidence to the contrary.
In re T.C.B., 166 N.C.App. 482, 485, 602 S.E.2d 17, 19 (2004) (citation omitted). Our Supreme Court has recognized the role of the trial court as finder of fact and the weight that must be accorded these findings. In In re Montgomery, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984), the Supreme Court stated, "[i]n cases involving a higher evidentiary standard, such as in the case sub judice, we must review the evidence in order to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." Id. "Although the question of the sufficiency of the evidence to support the findings may be raised on appeal, our appellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." Id. at 110-11, 316 S.E.2d at 252-53 (citations omitted).
We now turn to the specific findings to which respondent assigns error. Respondent first contends that the trial court erred in Findings 26, 30, 34, 35, and 36, findings related to Messer's cross-examination and the admission of past orders, for the same reasons stated in the first and second assignments of error. As discussed supra, we find no error in these findings.
Respondent next contends that Finding of Fact 43 is not supported by clear, cogent, and convincing evidence as respondent offered evidence of compliance with the case plan. We disagree.
Finding of Fact 43 states:
On February 8, 2002, the Court ordered the parents ... to participate in a list of 14 services and obligations outlined by the Court and attached to the Court's order which was made available to them. The mother failed to comply with most of the items on the list. She told the social worker that she attended parenting classes but failed to document the same with a certification of completion. The mother did not offer any evidence of such completion to this Court. In fact, enough time has passed that she could have again enrolled in parenting classes in an effort to meet this obligation. She failed to follow through with homemaker services. The mother told the social worker she has participated in household budgeting classes but failed to document the same. She has failed to offer any evidence of completion of such classes to this Court. The mother failed to obtain mental health counseling and treatment recommended by Dr. Aiello in a psychological evaluation of the mother. She failed to get a telephone. She failed to keep a clean and safe home environment for the children. The mother failed to pay child support as court established by the efforts of the child support agency. The mother has failed to find employment compatible with the needs of her children. She still works at the same position that she did when the children were taken from *542 her custody in December 2000. The mother testified that she had some educational constraints with respect to pursuing other employment; however, the court is concerned with respect to just how much effort has been taken with seeking compatible employment.
In In re B.S.D.S., 163 N.C.App. 540, 594 S.E.2d 89 (2004), after an adjudication of neglect of the child who had been sexually abused by the respondent-mother's boyfriend, the respondent-mother was ordered to comply with certain terms to demonstrate she was able to appropriately care for the child. Id. at 541, 594 S.E.2d at 91. These terms included attendance at a SAIS non-offending spouse group and participation in treatment recommended by DSS, in addition to three other requirements. Id. at 541-42, 594 S.E.2d at 91. The evidence at the termination hearing demonstrated that although the respondent-mother claimed to have completed the group session, she was unable to produce documentary support for her contention, and DSS was unaware of her completion. Id. at 545, 594 S.E.2d at 93. Further, although ordered to undergo therapy after evaluation by a psychologist, the respondent-mother failed to do so until three weeks prior to the termination hearing. Id. at 546, 594 S.E.2d at 93. The Court in B.S.D.S. found that this evidence was sufficient to support a finding of insufficient progress. Id. at 546, 594 S.E.2d at 93.
Here, similarly, the trial court ordered respondent to complete classes in parenting, budgeting, and homemaking. A social worker testified that she thought respondent might have attended five of the parenting classes, but that she had not completed the full program of six classes. Respondent herself also testified to attending only five parenting classes, but was unable to produce documentation to verify completion. DSS also offered evidence that respondent did not complete the required homemaker services or the budgeting classes. Respondent herself confirmed that she had not completed the homemaker classes. Thus, there is clear, cogent, and convincing evidence that respondent failed to complete the required classes.
The trial court also ordered respondent to obtain mental health counseling and treatment as recommended. Respondent was recommended to attend counseling after her initial psychological evaluation done after the first removal and adjudication of neglect of the children in early 2001. Respondent testified that although she starting counseling, she stopped when the children were returned to her physical custody in late 2001. DSS case workers testified that respondent failed to comply with the required counseling after the second removal of the children. Therefore, there is clear, cogent, and convincing evidence that respondent failed to comply with this portion of the court order.
The trial court also ordered respondent to have a phone. Although there is some evidence that respondent initially complied and had a phone installed, the assigned DSS case worker from June 2002 until April 2003 testified that respondent's phone had been disconnected, and that she was unable to reach defendant at any of the contact numbers. Clear, cogent, and convincing evidence therefore supports the trial court's finding.
Finally, the trial court ordered respondent to keep and maintain a clean and appropriate home environment. Prior to the second removal of the children in January 2002, the case worker at that time testified that respondent's maintenance of the home was better than upon DSS's initial visit, but remained inconsistent and required continual monitoring. Both children were placed in the parents' home as of August 2001, although legal custody remained with DSS, but were again removed in January 2002 after a visit by social workers revealed that the home was again in a state of great disorder. Following the second removal of the children, while DSS was continuing to attempt reunification, two unannounced home visits at different times of the day were made by another social worker to assess the condition of the home. Although she was unable to assess the interior condition of the home because respondent was not home on either occasion, the social worker reported the exterior of the home had lots of trash and debris, the screen door was busted, there was trash on the stoop and alongside the house and drive, and *543 debris in the yard, including furniture and broken toys. The record therefore supports a finding that respondent failed to keep a clean and safe home environment for the children.
The trial court did not err in finding that respondent failed to comply with most of the requirements of the list. Further, respondent does not challenge the evidence supporting the remainder of the finding of fact regarding respondent's failure to pay child support and provide evidence of compliance to DSS on a weekly basis. Therefore, clear, cogent, and convincing evidence supports Finding of Fact 43.
Respondent also contends the trial court erred in Finding of Fact 46, that respondent lacked initiative to comply with the directives and failed to perceive or determine that the services ordered by the court were needed by her. We disagree.
All of the findings of fact regarding respondent's in-court demeanor, attitude, and credibility, including her willingness to reunite herself with her child, are left to the trial judge's discretion. Therefore, any of the findings of fact regarding the demeanor of any of the witnesses are properly left to the determination of the trial judge, since she had the opportunity to observe the witnesses.
Oghenekevebe, 123 N.C.App. at 440-41, 473 S.E.2d at 398-99.
Here, the trial court, as stated in the findings of fact, had the opportunity to view respondent, hear her testimony, and judge her credibility in determining her attitude and initiative. Therefore, Finding of Fact 46 regarding respondent's demeanor is properly left to the determination of the trial judge and evidence in the record supports the trial court's finding.
Respondent next contends that clear, cogent, and convincing evidence does not support Finding of Fact 47, that the respondent was unable to articulate any plan by which the children would be provided for after she went to work. We disagree.
Here, respondent testified that she planned to work Wednesday through Saturday weekly from 7:00 p.m. to 2:00 or 3:00 a.m., that she could care for the children during the day after they came home from school, and stated generally that "then there would be a qualified good babysitter that I know would take care of my kids and they would be sleeping while I'm at work." Respondent offered no names of sitters or evidence that she had investigated options for nighttime care for the children. Although respondent's boyfriend was questioned as to whether he was familiar with children in his own family, and if he was able to watch the children, feed them, and put them to bed, respondent's boyfriend did not testify that he would provide child care for respondent's children while she worked. Respondent offered no further testimony as to specifics of how child care would be provided if the children were placed back into her care. As respondent failed to articulate a specific plan of care for the children, clear, cogent, and convincing evidence supports this finding.
Respondent further asserts that Finding of Fact No. 48 is not supported by clear, cogent, and convincing evidence. We disagree.
The pertinent portions of Finding of Fact 48 state that:
She has lived for the past year and [a] half in a duplex apartment in Cumberland County, North Carolina which she admits is inadequate and not in a community conducive for the children. Specifically, it would not be an environment in which she would be comfortable with the children being outside of the home. Her response to this circumstance is to move in with her boyfriend while at the same time maintaining her own apartment all of which, in and of itself, shows instability on her part.

(Emphasis added.) Respondent's own testimony supports the trial court's finding that respondent has maintained a residence for the past year and a half in a neighborhood she considered unsuitable for children, and that she had recently begun living with her boyfriend while continuing to maintain her own residence. Further, respondent's testimony when questioned as to her plans if her relationship with her boyfriend did not work out provides evidence to support such a finding. Respondent stated:

*544 I have an apartment currently right now that I continue renting. I do plan to keep on looking for apartments that are in a better-in a better neighborhood. So if something does happen to Mike and I, I do have a place where my kids and I go to [sic]....
I do plan on continuing to work, so if something does happen to us, I don't have to try to find a job.
Although different inferences could be drawn from respondent's testimony that she continued to maintain and search for alternative housing after living with her boyfriend for only a month, the trial court is charged with determining what inference should be drawn, and the evidence supports a conclusion that such behavior is an indication of instability. See Gleisner, 141 N.C.App. at 480, 539 S.E.2d at 365-66 ("[i]f different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected"). Therefore clear, cogent, and convincing evidence supports this finding and conclusion.
Respondent next contends there is a lack of clear, cogent, and convincing evidence to support Finding of Fact 49, that respondent had demonstrated a continued failure to make a proper plan for her children, had done little other than visit with her children, and had failed to perceive the danger in past conditions which led to the children's removal and continued to fail to perceive that reasoning. We disagree.
As discussed supra, "findings of fact regarding respondent's in-court demeanor, attitude, and credibility, including her willingness to reunite herself with her child, are left to the trial judge's discretion." Oghenekevebe, 123 N.C.App. at 440-41, 473 S.E.2d at 398-99.
Here, evidence in the record indicates that in the more than three year period from the first DSS assessment, respondent was able to comply only sporadically with the case plan for initial return of the children, and was unable to properly maintain her home and care for the children after her first reunification with the children in November 2001, resulting in removal of the children in January 2002. Further, respondent was unable to make sufficient progress under the court-ordered plan following the second removal of the children, so that reunification efforts were ceased in July 2002. Since the cessation of reunification efforts, although respondent maintained some contact with DSS, she failed to pay child support throughout 2002 and made only small payments totaling less than $260.00 and some gifts of clothing and a phonics game in 2003. Further, although respondent initially maintained contact with social workers, from November 2003 to late January 2004 respondent ceased contacting DSS with no explanation. Finally, respondent failed to consistently attend permanency planning meetings. Therefore, there is clear, cogent, and convincing evidence to support the trial court's findings and conclusion as to respondent's demeanor and attitude.

B. Conclusion of Law

Respondent also contends that the trial court's findings of fact are insufficient to support the conclusion of law that grounds exist for termination of respondent's parental rights. We disagree.
Respondent first contends that the findings of fact are insufficient to support grounds for termination based on neglect. As noted supra, N.C. Gen.Stat. § 7B-1111(a)(1) states that the trial court may terminate parental rights upon a finding that "[t]he parent has ... neglected the juvenile." Id.
In In re Ballard, our Supreme Court recognized that in most termination cases the children have been removed from the parents' custody before the termination hearing, and therefore, "to require that termination of parental rights be based only upon evidence of events occurring after a prior adjudication of neglect which resulted in removal of the child from the custody of the parents would make it almost impossible to terminate parental rights on the ground of neglect." Ballard, 311 N.C. at 714, 319 S.E.2d at 232. Ballard held that
evidence of neglect by a parent prior to losing custody of a child  including an adjudication of such neglect  is admissible in subsequent proceedings to terminate parental rights. The trial court must also *545 consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect.
Id. at 715, 319 S.E.2d at 232. In In re Beasley, 147 N.C.App. 399, 555 S.E.2d 643 (2001), this Court further addressed the petitioner's burden when a prior adjudication of neglect had been established.
"[I]f there is no evidence of neglect at the time of the termination proceeding ... parental rights may nonetheless be terminated if there is a showing of a past adjudication of neglect and the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to [his or] her parents.["] "Thus, the petitioner need not present evidence of neglect subsequent to the prior adjudication of neglect."
Beasley, 147 N.C.App. at 404-05, 555 S.E.2d at 647 (citation omitted).
Here, as discussed supra, both children were adjudicated neglected by the trial court in 2001 on the basis of the youngest child's "failure to thrive" and the unsafe and unsanitary conditions of the home. Continued efforts were made to reunite the children with their parents, but subsequent to both children's return in August 2001, the children were again removed for unsanitary conditions in January 2002. Placement remained in foster case thereafter due to the parents' "actions[ ] and inactions" in properly complying with the service plan. Respondent was given a further plan which included training and education in parenting, homemaking, and budgeting, as well as counseling, directives as to involvement in medical care, maintenance of a telephone for emergency situations, and child support. Clear and competent evidence supports the trial court's findings that respondent failed to substantially comply with much of the list. Further, the trial court, after hearing testimony from respondent, found the mother lacked initiative to comply with the trial court's directives, failed to perceive the need for such services, and had failed to recognize the development issues which were the partial basis for the original adjudication of neglect, and thus concluded it was likely the children would not be safe and properly cared for and supervised if returned to the home. The findings of fact therefore support the trial court's conclusion of a probability of repetition of neglect if the juveniles were returned to respondent.
Respondent also contends that the findings of fact are insufficient to support grounds for termination based on failure to make reasonable progress. We again disagree.
As noted supra, N.C. Gen.Stat. § 7B-1111(a)(2) provides for termination of parental rights if "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." Id. "Willfulness may be found where a parent has made some attempt to regain custody of the child but has failed to exhibit `reasonable progress or a positive response toward the diligent efforts of DSS.'" In re B.S.D.S., 163 N.C.App. at 545, 594 S.E.2d at 93 (citations omitted). "`[E]xtremely limited progress is not reasonable progress.' This standard operates as a safeguard for children. If parents were not required to show both positive efforts and positive results, `a parent could forestall termination proceedings indefinitely by making sporadic efforts for that purpose.'" Id. (citations omitted). Thus, our Courts have held that "a respondent's prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness `regardless of her good intentions,'" and will support a finding of lack of progress during the year preceding the DSS petition sufficient to warrant termination of parental rights under section 7B-1111(a)(2). Id. at 546, 594 S.E.2d at 93 (citation omitted).
Here, as discussed supra, respondent failed to make adequate progress in response to the court-ordered plan, and reunification efforts were ceased in July 2002. Although respondent has shown sporadic efforts since that time, respondent has failed to make *546 reasonable child support payments, has failed to perceive the need for instruction in areas which led to the children's removal, and has failed to demonstrate initiative to comply with the trial court's directives to correct the conditions which led to removal. Therefore the findings of fact support the trial court's conclusion that respondent failed to make reasonable progress.
In conclusion, the record reveals clear, cogent, and convincing evidence to support the trial court's findings. Although there is evidence to the contrary, "the district court's findings are binding on appeal[.]" In re T.C.B., 166 N.C.App. at 485, 602 S.E.2d at 19. Such findings are sufficient to support the conclusion that grounds existed to terminate respondent's parental rights. Therefore, the trial court's order of termination is affirmed.
Affirmed.
Judge McCULLOUGH concurs.
Judge LEVINSON dissents in a separate opinion.
LEVINSON, Judge dissenting.
I respectfully dissent. Because the record fails to reveal clear, cogent and convincing evidence necessary to support the findings of fact and conclusions of law supporting grounds for termination of respondent-mother's parental rights, the order of the trial court as it pertains to her must be reversed. I make no comment regarding sections I and II of the majority opinion.
As a preliminary matter, I note that I have set forth, in some detail, the evidence presented during the termination hearing. While this may repeat, in some instances, that which the majority opinion outlines, it is necessary to fully explain and discuss my reasoning.
Respondent is the mother of K.W. and J.W., two boys born to different fathers. K.W.'s father currently lives in Nevada and has had little contact with K.W. J.W.'s father, Mr. W., married respondent and moved the family to North Carolina.
In December 2000 respondent took J.W., then an infant, to the hospital because of his "spitting up." The hospital diagnosed J.W. with acid reflux and failure to thrive. DSS was contacted and made two home visits in December 2000. During the first home visit, the DSS worker observed an unsafe environment (because an ax, knife and loaded gun were unsecured), and an unsanitary environment (because of clothes and dirty dishes piled throughout the house). On a follow-up visit the next day, the gun, ax, and knife were secured and the home was clean. Nonetheless, DSS assumed custody of J.W. and K.W. by means of a petition alleging neglect because of unsafe and unsanitary living conditions. In addition, J.W. was alleged to be a neglected juvenile for lack of medical care. By order entered 16 February 2001, the children were adjudicated neglected and their custody continued with DSS.
During 2001, respondent and Mr. W. were allowed increasingly unsupervised and extended visitation. K.W. was returned to the care of respondent and Mr. W. in May 2001; J.W. was returned to their custody in August 2001. DSS continued to maintain placement authority for both boys. On 9 November 2001 a permanency planning hearing was held. In maintaining reunification as the permanent plan, the trial court included the following findings of fact in its order:
(6) (b) The [respondent and Mr. W.] have complied with the service plan and the psychological assessments have been favorable.
(c) Both children have been home since August, 2001. While the placement has gone well, the Department and GAL do have some concerns over the cleanliness of the home and the odor therein. However, the [respondent and Mr. W.] have progressed a great deal and the situation as it exists today would not justify a removal of the children from that home. The Department and GAL wish to continue to monitor the placement.
During the fall of 2001, the DSS worker visited the home several times each month. She described respondent's housekeeping as "sporadic" and noted that clothes and dirty dishes were often visible. DSS made two more home visits in January 2002. On 7 January 2002 the home was worse than usual, *547 with dishes and food left out, dirty clothes piled in the laundry room, cans of beans on the floor, no sheets on the beds, and toys strewn about the home. However, when the worker returned two days later, "the house was very clean, laundry room, kitchen, dining room floors, boy[s'] room, and den. It looked like a totally different house[.]" Despite the improvement, on 16 January 2002, the GAL and Attorney Advocate filed a motion for review to address placement and, on 25 January 2002, DSS obtained an order again removing the children from the home.
A subsequent permanency planning hearing was held 8 February 2002. At that time, the permanency goal was changed to a dual plan of reunification and relative placement. The trial court granted custody of the children to DSS, allowed supervised visitation for respondent and Mr. W., and ordered respondent and Mr. W. to comply with a case plan listing fourteen requirements, twelve of which applied to mother:
1. Attend Parenting classes
2. Participate  DSS Homemaker services
. . . .
4. Participate in household budgeting classes with Extension Services
5. Obtain counselling [sic] and treatment as recommended by Dr. Aiello.
6. Pay child support
. . . .
8. Mother obtain and maintain employment with a schedule compatible with the needs of the children
9. Obtain a telephone
10. Attend all medical and dental appointments with children or conference with care providers to maintain familiarity with children's condition
11. Keep and maintain a clean and appropriate home environment
12. Provide evidence of compliance to DSS or GAL on a weekly basis
13. Maintain stable residence and not have boarders or house guests for extended periods of time
14. Sign releases for DSS and GAL to allow communication by DSS and GAL with all service providers above
At the termination hearing, a social worker testified the children were removed from the home the second time due to respondent's inconsistent housekeeping; inconsistent attendance of the children at daycare (notwithstanding the fact respondent was home during the daytime); and inconsistent medical care for the children. With respect to the concern about medical care, the record shows only that (1) J.W. had a cough and a fever of between 102 and 103 degrees for a couple of days in December 2001, and (2) in the fall of 2001, respondent had failed to return phone calls to the doctor concerning test results of J.W.'s scalp fungus. There was no evidence from this period of time concerning a failure to thrive on the part of J.W., or of respondent's failure to provide the children with adequate nutrition.
Following the 8 February 2002 permanency planning hearing, respondent attended every scheduled visitation with the children except one when she had car trouble. On that occasion, respondent called and rescheduled the visit. The DSS social worker testified that respondent's behavior during visits was appropriate. In the spring of 2002, respondent attended the only doctor's appointment scheduled for the children.
In the early summer of 2002, prior to 12 July 2002, the social worker made two unannounced visits to the home. Because respondent was not home either time, the worker was unable to see inside the house. Around the exterior of the house, she observed "a lot of trash and debris," a "busted screen," and pieces of furniture and broken toys in the yard.
Another permanency planning hearing was held 12 July 2002. The goal was changed to "relative placement." All visits between respondent and the children were ceased, and respondent has not been allowed visitation since that time. DSS was relieved of all efforts to work with respondent on her case plan. Respondent nevertheless continued to call the social worker regularly, sometimes as often as once a week, for the following one and one half years, to ask how the children *548 were doing. Respondent telephoned the DSS worker regularly until 4 November 2003. She stopped calling for two months and resumed calling DSS again in January 2004. Respondent continued to bring items of clothing and money to DSS for the children. Beginning 12 July 2002, respondent was neither informed of the doctors' appointments for the children, nor given the names of their health care providers.
In June 2002 Mr. W. moved to Mississippi and had no further contact with DSS, the children, or respondent.
Following another permanency planning hearing held 8 August 2003, an order was entered which changed the goal to adoption. A DSS worker testified that the change was due to "a number of inconsistencies and a lack of compliance to that list [in the case plan]."
Respondent's mother, Ms. Gibson, and respondent's live-in boyfriend, Mr. Slonecker, testified at the termination hearing. They each attested to the fact that respondent was a good housekeeper and that she kept a clean home. Ms. Gibson stated that, since the children were taken away from her, respondent had matured a great deal and become more responsible. Mr. Slonecker stated that he worked full-time as a carpenter and has a three bedroom home with a yard in a quiet neighborhood. He stated respondent's home was clean and appropriate when they began dating in 2003 and that respondent continued to be a good housekeeper. Mr. Slonecker testified that if the children were returned to respondent, he could watch them at night while respondent worked.
The court terminated respondent's parental rights in both children based on neglect, pursuant to N.C.G.S. § 7B-1111(a)(1), and her failure to correct the conditions leading to the removal of the children from the home, pursuant to N.C.G.S. § 7B-1111(a)(2).
In its order terminating respondent's parental rights, the trial court made 57 findings of fact. On appeal, respondent challenges many of these findings as unsupported by evidence in the record. Specifically, as they relate to the grounds set forth in N.C.G.S. §§ 7B-1111(a)(1) and (a)(2), respondent challenges portions of findings numbers 43, 46, 47, 48, 49, and 55, and contends that the remaining findings of fact do not support these grounds.
I first turn to a review of the applicable law.
"A termination of parental rights proceeding consists of two phases. In the adjudicatory stage, the petitioner has the burden of establishing by clear and convincing evidence that at least one of the statutory grounds listed in N.C. Gen.Stat. § 7B-1111 exists." In re Anderson, 151 N.C.App. 94, 97, 564 S.E.2d 599, 602 (2002) (citation omitted). "Upon determining that one or more of the grounds for terminating parental rights exist, the court moves to the disposition stage to determine whether it is in the best interests of the child to terminate the parental rights." In re Young, 346 N.C. 244, 247, 485 S.E.2d 612, 615 (1997). "We review whether the trial court's findings of fact are supported by clear and convincing evidence and whether the findings of fact support the conclusions of law." Anderson, 151 N.C.App. at 97, 564 S.E.2d at 602 (citation omitted).
According to N.C.G.S. § 7B-1111(a)(1) (2003), the ground concerning neglect, a court may terminate one's parental rights where:
The parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101.
"Neglect", in turn, is defined as follows:
Neglected juvenile.  A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law....
N.C.G.S. § 7B-101(15) (2003).
For a termination of parental rights based on neglect, the trial court must determine *549 whether neglect is present at the time of the termination proceeding. See In re Ballard, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984). "[E]vidence of neglect by a parent prior to losing custody ... is admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect[.]" Id. at 715, 319 S.E.2d at 232 (citation omitted). The probability of a repetition of neglect must be shown by clear, cogent and convincing evidence. See Young, 346 N.C. at 250, 485 S.E.2d at 616.
According to N.C.G.S. § 7B-1111(a)(2), the ground concerning reasonable progress, a court may terminate one's parental rights where:
The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile....
In explaining the application of this ground, this Court recently stated:
Thus, to find grounds to terminate a parent's rights under G.S. § 7B-1111(a)(2), the trial court must perform a two part analysis. The trial court must determine by clear, cogent and convincing evidence that a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and, further, that as of the time of the hearing, as demonstrated by clear, cogent and convincing evidence, the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child. Evidence and findings which support a determination of "reasonable progress" may parallel or differ from that which supports the determination of "willfulness" in leaving the child in placement outside the home.
A finding of willfulness does not require a showing of fault by the parent. Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort. A finding of willfulness is not precluded even if the respondent has made some efforts to regain custody of the children.
With respect to the requirement that the petitioner demonstrate that the parent has not shown reasonable progress ... evidence supporting this determination is not limited to that which falls during the twelve month period next preceding the filing of the motion or petition to terminate parental rights [as it was under the former statute].
In re O.C. and O.B., ___ N.C.App. ___, ___, 615 S.E.2d 391, 396 (2005) (quotations and citations omitted).
In the instant case, the trial court made the following findings of fact. First, findings 1 through 24 deal generally with the procedural history of the motions to terminate parental rights; jurisdiction; and the parties and persons who appeared in court. Findings 25 through 37 concern the circumstances surrounding the 16 February 2001 adjudication of neglect when the children were initially removed from the home, and the history of actions taken by the trial court as a result of permanency planning hearings. In addition, the court made the following findings which have relevance to the termination of mother's parental rights:
38. Since the Court's order on January 25, 2002, the children have been in the full custody and care of DSS and have continuously remained out of the parents' home as of the date of this hearing. At the time of the filing of the motion for termination of parental rights, the children had been out of the parents' home for a total of over 20 months.
39. These children were neglected by the mother ... in December 2000 as described by the Court in its order on February 9, 2001....
. . . .
41. When the children were both placed or returned (after the August 10, 2001 hearing) to the physical care of [mother and Mr. W.] with weekly home visits from the DSS social worker, *550 the parents ... failed to consistently maintain a safe and sanitary home for them.
. . . .
45. Up to a point, the mother has kept in contact with the social worker; however, for a period of two and one-half (2½) months she failed to contact the social worker and at other times, she has been somewhat sporadic.
I next turn to specific portions of additional findings of fact which have been challenged on appeal and are essential to my evaluation of this matter.
I first consider finding of fact number 43:
On February 8, 2002, the Court ordered the parents ... to participate in a list of 14 services and obligations outlined by the Court and attached to the Court's order which was made available to them. The mother failed to comply with most of the items on the list. She told the social worker that she attended parenting classes but failed to document the same with a certification of completion. The mother did not offer any evidence of such completion to this Court. In fact, enough time has passed that she could have again enrolled in parenting classes in an effort to meet this obligation. She failed to follow through with homemaker services. The mother told the social worker she has participated in household budgeting classes but failed to document the same. She has failed to offer any evidence of completion of such classes to this Court. The mother failed to obtain mental health counseling and treatment recommended by Dr. Aiello in a psychological evaluation of the mother. She failed to get a telephone. She failed to keep a clean and safe home environment for the children. ... The mother has failed to find employment compatible with the needs of her children. She still works at the same position that she did when the children were taken from her custody in December 2000. The mother testified that she had some educational constraints with respect to pursuing other employment; however, the court is concerned with respect to just how much effort has been taken with seeking compatible employment.
There is not clear and convincing evidence in the record that mother "failed to keep a clean and safe home environment for the children." While there was evidence that mother failed to keep a clean and safe home during certain times leading up to the removal of the children, the petitioner produced no evidence of the same conditions for the eighteen month period preceding the termination hearing. Petitioner did not produce any photographs illustrating the workers' testimony concerning the conditions of respondent's home. In fact, the only photographs in the record were those introduced by respondent illustrating that her current home was clean. As late as the permanency planning hearing of November 2001, the trial court itself found that, while the GAL had some concerns about the cleanliness of respondent's home, she "[had] progressed a great deal and the situation as it exists today would not justify a removal of the children from [her] home." The last home visit by DSS occurred in late June or early July 2002. The termination hearing was held in mid-February 2004. The record evidence is uniform in that, for a substantial period of time next preceding the termination hearing, mother kept a clean and safe home, and there is an absence of clear and convincing evidence in the record to suggest she does not, or would not, keep an adequately safe and sanitary home.
There is not clear and convincing evidence in the record that mother "failed to get a telephone", or "failed to comply with most of the items on the list [outlined by the trial court]." The uncontradicted evidence showed respondent attended parenting classes; obtained a telephone and provided the phone number to DSS by the summer of 2002;[1] attended the children's medical appointments; *551 maintained a clean and appropriate home environment for eighteen months preceding the termination hearing; provided evidence of ongoing compliance to DSS approximately once each week; maintained a stable residence with no boarders or guests for extended periods of time following the entry of the case plan; maintained employment; and signed releases for DSS and the GAL.
There was not clear and convincing evidence to support the court's finding that mother "did not offer any evidence of . . . completion of parenting classes to this Court." On the contrary, respondent testified she completed the parenting course, and a DSS worker testified that the parenting classes requirement was satisfied.
Nor is there clear and convincing evidence in the record that mother "failed to obtain mental health counseling and treatment recommended by Dr. Aiello in a psychological evaluation. . . ." The record shows respondent obtained a psychological evaluation. Furthermore, there was significant evidence that she followed the recommendations of that evaluation. One DSS worker, who was assigned to the case in the spring of 2001, testified that respondent complied with all the psychological recommendations. A different worker, assigned to the case one year later, contradicted this testimony, stating there had been no compliance with the recommendations of the psychological evaluation during the previous worker's tenure. Respondent testified that she had attended counseling but stopped once the children were returned to her care. When respondent returned to the counseling agency to apply for further counseling, she was told she did not require their services. And in three separate court orders, representing hearings held 11 May 2001, 10 August 2001, and 9 November 2001, the trial court found that "[Respondent has] complied with the [case] plan and the psychological assessments have been favorable." No psychological evaluation was offered into evidence. While I recognize that one social worker stated that the psychological requirements were not met, my review of the record demonstrates that the evidence is not clear and convincing on this point.
I next address portions of finding of fact number 46:
The Court had the opportunity to view the witnesses, hear their testimony, and judge their credibility. The Court had the opportunity to judge the attitude of the mother as a witness and to determine whether the neglect would likely reoccur if the children were returned to her care. The mother has disclosed a lack of initiative on her part to comply with the Court's directives; she has failed to perceive or determine that these services mentioned by the Court were needed by her to provide or to assure the Court that she could provide a safe and sanitary environment for her minor children and for her own overall well being.

Notwithstanding the trial court's correct observation that one of its functions is to determine the weight and credibility of witness testimony, this does not divest this Court of its responsibility to evaluate whether the evidence presented meets the threshold of clear and convincing evidence. As it concerns the court's findings that mother "lacked initiative" and "failed to perceive or determine that the[] services mentioned by the Court were needed by her," there is simply insufficient evidence in the record to support these generalized findings. The evidence was uncontradicted that respondent had complied with many of the directives in her case plan  something the trial court itself *552 observed in its previous orders. More importantly, all the evidence showed that, for at least one year prior to the termination hearing, respondent had maintained a safe and sanitary home.
I next address finding of fact number 47:
The mother has testified that she would be able to meet the needs of the children if placed with her immediately. However, she is unable to articulate any plan by which the children would be provided for after she goes to work.

Respondent did articulate a plan for her children's care while she is at work. She and Mr. Slonecker both testified that Mr. Slonecker would be responsible for the children while she worked.
I next address finding of fact number 48:
The mother has lived with Mr. W. in at least two residences since these cases began; at times others have resided with them. One of the Court's directives was to maintain stable housing and not have guest[s] or boarders for extended periods. She has lived for the past year and [a] half in a duplex apartment in Cumberland County, North Carolina which she admits is inadequate and not in a community conducive for the children. Specifically, it would not be an environment in which she would be comfortable with the children being outside of the home. Her response to this circumstance is to move in with her boyfriend while at the same time maintaining her own apartment all of which, in and of itself, shows instability on her part. She has offered no evidence of any attempt to locate any other residence.
At the time of the termination proceedings, respondent had maintained her duplex apartment for one and one half years. There was no evidence she had others residing with her during that time or had "boarders for extended periods." While continuing to maintain her apartment, respondent moved in with Mr. Slonecker, whom she had been dating for one year. While respondent acknowledged that her duplex apartment was in an undesirable neighborhood, this is more akin to evidence of poverty than to "unstable" housing. The inference that respondent has failed to maintain stable housing is not reasonably supported by the evidence.
I next review the following underlined portions of finding of fact number 49:
The . . . actions of the mother demonstrate a continuation of her failure to make a proper plan for her children. She has failed to do these things necessary to show she will be able to appropriately parent her children. They were placed back in her home in 2001 and she was unable to properly care for them and they were again removed by the Court. After being specifically told what was expected of her to do to demonstrate an improvement of her parenting skill and ability, she failed to do very little except visits with her children. She stated on the stand that she was wrong or at fault about her children; she does not perceive the need to comply with the court's directives (service plan) to demonstrate to the Court that she is able to provide a safe and sanitary environment for her children. She failed to perceive the meaning of [J.W.'s] condition (failure to thrive) in December 2000; she failed to perceive the danger, unsafe and unsanitary conditions of her home in December 2000 and in January 2002 (period the children were back in her home). At the time of her testimony in this hearing, she still discloses her failure to perceive the reasoning for the removal of her children. For example, she does not recognize development issues of minor children which is partially evidenced in [J.W.'s] case of quick recovery upon his receiving proper care. It is likely that these children would not be safe and properly cared for and supervised if placed in her home.
The uncontradicted evidence showed respondent had a plan for the children. She and the children would live with Mr. Slonecker. There were two unoccupied bedrooms in the home and Mr. Slonecker would babysit in the evenings while she worked. Some of the evidence showed respondent had imperfect compliance with certain requirements of her case plan. Overall, however, the evidence demonstrated that she made significant improvements to her housekeeping practices; was consistently attentive to the medical *553 needs and concerns of the children; and was generally compliant with the children's attendance at daycare when they were last in her care. The record shows only that respondent had maintained a clean home for at least one year and had maintained extensive contact with DSS for over eighteen months following the end of her visits. Respondent's circumstances have changed markedly since the children were removed: she has demonstrated consistency in her housekeeping, housing, employment, and concern for the children; she has separated from her husband; re-established contact with her mother; and developed a stable relationship with Mr. Slonecker.
With respect to the court's finding that respondent "failed to perceive the meaning of [J.W.'s] condition (failure to thrive) in December 2000," I observe, first, that it was respondent who took J.W. to the hospital due to concerns about symptoms associated with acid reflux and failure to thrive. Secondly, there are few, if any, facts set forth in the 16 February 2001 order adjudicating J.W. neglected that suggests mother's omissions concerning medical care for the children were significant: the court found that "the respondent parents have attended some medical care appointments for . . . [J.W.] . . . in an attempt to provide better care for [him]." In addition, the neglect adjudication order stated only that J.W. was diagnosed with failure to thrive and, further, that J.W. "requires some special medical care. . . ." While these findings, and the conclusion of neglect, have some relevance to the current motion to terminate parental rights, these established findings related to mother's failure to attend to the medical needs of J.W. are, frankly, negligible and mostly unhelpful to petitioner in this termination matter.
With respect to the finding that mother "failed to perceive the danger, unsafe and unsanitary conditions of her home in December 2000 and in January 2002," I note, first, that the uncontradicted evidence was that respondent cleaned her home by the second DSS home visit in December 2000. The weapons had been secured and have not been noted as a problem since. In 2002, the evidence was that respondent's housekeeping was inconsistent. By the second home visit, in January 2002, respondent had cleaned the home. The evidence does not support the inference, by clear and convincing evidence, that respondent "failed to perceive" the dangers of an unsafe and unsanitary home.
I next address the following portion of finding number 49:
At the time of her testimony in this hearing, she still discloses her failure to perceive the reasoning for the removal of her children. For example, she does not recognize development issues of minor children which is partially evidenced in [J.W.'s] . . . quick recovery upon his receiving proper care.
Respondent's testimony corroborated the two diagnoses given to J.W. at the time of his hospitalization in December 2000: failure to thrive and acid reflux. Respondent stated the children were initially taken away from her due to the house being unkempt and J.W. having been diagnosed with acid reflux and failure to thrive. Respondent had demonstrated to the satisfaction of the court, by August 2001, that she could care for J.W. Respondent described the types of pureed food she had been instructed to feed J.W. during the time he was returned to her care. There was no evidence J.W. again exhibited failure to thrive while in respondent's care. From the foregoing evidence, it does not follow that respondent did not "perceive" the reason for the removal of the children or recognize developmental issues.
I next address the underlined portion of finding number 55:
The children are living in the same foster home. They have adjusted well to the foster family. Both children are healthy. . . . [J.W.] is no longer suffering from failure to thrive. The boys are in need of a stable, safe and secure environment. They have now been in the same home for over two (2) years and this home has been a [good] environment. The mother has not seen the children for more than one year. . . . The priorities of the mother and Mr. W are inconsistent with the welfare of their children.
*554 For the reasons already discussed, the record does not support a finding that respondent's priorities are "inconsistent with the welfare of [the] children." Respondent maintained a clean home and displayed consistent concern for the welfare of the children. And, frankly, on this record, it is unclear what the trial court meant by "[t]he priorities of the mother . . . are inconsistent with the welfare of [the] children."
I now consider whether the findings of fact, which are supported by clear, cogent and convincing evidence, are sufficient to support the court's conclusion that grounds exist to terminate respondent's rights based on neglect, G.S. § 7B-1111(a)(1), and failure to correct the conditions leading to the removal of the children, G.S. § 7B-1111(a)(2).
First, I easily conclude that the findings of fact which are supported by sufficient evidence in the record do not support grounds for termination pursuant to G.S. § 7B-1111(a)(1) (neglect). Here, the findings do not show a probability of a repetition of neglect based upon any one or more of the central arguments made by DSS: keeping a clean home; attentiveness to medical care; and stable residence and employment. And, as already explained, mother's imperfect compliance with the case plan does very little on these facts to establish, by clear and convincing evidence, neglect under G.S. § 7B-1111(a)(1).
I similarly conclude that the findings of fact which are supported by sufficient evidence in the record do not support grounds for termination pursuant to G.S. § 7B-1111(a)(2) (reasonable progress). The circumstances leading to the children's removal from the home were an unsafe and unsanitary home environment, and inconsistent medical care for J.W. For all the reasons discussed above, the record evidence does not demonstrate, and the supported findings of fact do not support, a conclusion that mother failed to make reasonable progress in correcting those conditions which led to the removal of the children. And, again, mother's imperfect compliance with the case plan does very little on these facts to establish, by clear and convincing evidence, failure to make reasonable progress under G.S. § 7B-1111(a)(2).
As to both grounds found by the trial court (neglect and failure to make reasonable progress), it is clear that the trial court relied, in very large measure, on mother's alleged failures to abide by the case plan. However, compliance with action items requested by DSS, or ordered by the court, does not necessarily establish or defeat the grounds for termination set forth in G.S. § 7B-1111. By way of illustration, there is little or nothing in this record to explain how psychological treatment related to the need for mother to keep a clean and sanitary home, a central part of this termination matter. The psychological report wasn't even admitted into evidence. Even if a clinical regimen were recommended as a result of the "favorable" assessment, and mother failed to abide by the same, DSS has not demonstrated a connection between such a failure and the statutory termination grounds alleged. Nor is it clear why, on these facts, mother's failure to gain differing employment with daytime hours  something referenced in finding of fact 43  necessarily supports either ground for termination. Or why her evening work schedule is necessarily "incompatible" with the needs of the children. Not all parents work "bankers' hours." While it is clear that the court urged  and respondent resisted  efforts to secure employment doing something other than serving cocktails at a nighttime establishment, it is unclear how this arguable failure to comply with the case plan necessarily helps establish the termination grounds alleged. Furthermore, it is unclear what mother failed to "perceive"  or what "initiative" she failed to demonstrate.
In conclusion, the findings and record evidence fall short of that required to terminate the relationship between mother and these two children. Accordingly, I would reverse those portions of the order terminating mother's rights over J.W. and K.W.
NOTES
[1] The majority relies on the testimony of social worker Paige Black to establish mother failed to obtain a telephone and that Ms. Black was unable to contact mother from June 2002 until April 2003. However, Ms. Black's testimony does not establish that she even attempted to call mother after 12 July 2002. For the period of time preceding 12 July 2002, Ms. Black testified she was not able to reach mother at the numbers provided "at that residence." Ms. Black was referring to the residence where mother lived with her husband before she moved into her duplex apartment in August 2002. All of Ms. Black's testimony indicates her efforts to contact mother occurred prior to the 12 July 2002 hearing terminating reunification. Ms. Black testified, "When we were released of reunification efforts on July 12th, that's when my actual efforts with [mother] ceased[.]" While she was the worker, Ms. Black testified that mother called her "regularly." The worker assigned to the case from April 2003 to February 2004, Ann Verdin, testified that mother called her regularly as well. Respondent mother testified she gave Ms. Black her telephone number when she moved into her duplex apartment in August 2002. Mother testified she gave her number to Ms. Verdin as well and, that as of the date of the hearing, she had had a working telephone since August 2002.