IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-103

No. 411A20

Filed 24 September 2021

IN THE MATTER OF: B.J.H. and J.E.H.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 29 June 2020 by Judge William F. Brooks in District Court, Yadkin County. This matter was calendared for argument in the Supreme Court on 19 August 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*James N. Freeman Jr. for petitioner-appellee Yadkin County Human Services Agency.*

*Paul W. Freeman Jr. for appellee Guardian ad Litem.*

*Christopher M. Watford for respondent-appellant father.*

*David A. Perez for respondent-appellant mother.*

MORGAN, Justice.

¶ 1     Respondent-mother and respondent-father (together, respondents) appeal from the trial court's order terminating their respective parental rights to the juveniles "Ben" and "John."[1] Respondents challenge the evidentiary basis for certain findings of fact made by the trial court. Respondents also dispute the ability of the

---

[1] We use pseudonyms to protect the juveniles' identities and to promote ease of reading.

trial court's findings to support a conclusion that grounds existed to terminate their parental rights to the two juveniles. Because we conclude that the evidence is sufficient to yield findings of fact which amply support the ground for terminating the parental rights of both respondent-mother and respondent-father for willful failure to make reasonable progress under N.C.G.S. § 7B-1111(a)(2) (2019), we affirm the trial court's order terminating both respondents' parental rights.

## I. Factual and Procedural Background

On 20 January 2017, Wilkes County Department of Social Services (WCDSS) received a Child Protective Services (CPS) referral alleging that respondents were homeless, that respondents were struggling to provide for their two minor children Ben and John, and that Ben had tested positive for Subutex[2] at the time of his birth. An investigation conducted by WCDSS confirmed that the family was homeless. While respondent-mother and the children stayed with relatives for a brief period of time during the pendency of the investigation, they were asked to leave when burn marks were discovered in the bedroom which was being occupied by respondent-mother. Respondent-mother entered into an In-Home Family Services Agreement with WCDSS on 5 April 2017. Pursuant to the terms of the agreement, respondent-

---

[2] Subutex is one of many brand names for buprenorphine, a drug used to treat opioid use disorders by preventing withdrawal symptoms caused by cessation of opioid use. *Buprenorphine*, Substance Abuse and Mental Health Servs. Admin., https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions/buprenorphine (May 14, 2021).

mother was to obtain a substance abuse assessment, to submit to random drug screens, and to complete parenting classes. Respondent-mother tested positive for the presence of methamphetamine four times between 25 January 2017 and 12 April 2017, and she completed a substance abuse assessment which resulted in diagnoses of generalized anxiety disorder, panic disorder, attention-deficit/hyperactivity disorder, and amphetamine use disorder (severe).

¶ 3      WCDSS transferred respondents' case to Yadkin County Human Services Agency (YCHSA) in May 2017 after respondent-mother, Ben, and John began to reside with respondent-mother's grandmother. Although respondent-mother attended three substance abuse counseling sessions, she missed several appointments and continued to test positive for methamphetamine. Also, respondent-mother attended only four of the ten parenting classes which she was assigned to complete. WCDSS and YCHSA unsuccessfully attempted to contact respondent-father on at least thirty-eight occasions while providing services to the family. The efforts of the agencies to communicate with respondent-father included their request of respondent-mother to ask respondent-father to contact the agencies, due to respondents' contact with one another and the agencies' ongoing inability to contact respondent-father. During the course of the family's involvement with WCDSS and YCHSA, respondent-father did not provide care for Ben or John, contacted the children sporadically, and failed to contact the assisting agencies.

¶ 4 On 31 August 2017, respondent-mother admitted that she operated an automobile immediately after using methamphetamine and while Ben was in the vehicle, prompting YCHSA to file a juvenile petition on 1 September 2017 alleging that both Ben and John were neglected juveniles. The trial court held a hearing on the petition on 14 September 2017 and entered an order adjudicating the children to be neglected juveniles on 11 October 2017. The trial court found that both respondents were unemployed and "ha[d] not adequately addressed the conditions that led to the YCHSA filing its juvenile petition." The children were placed in YCHSA custody by the trial court, and the maternal great-grandmother of the juveniles was identified as an appropriate relative placement. Respondents were awarded one hour of biweekly supervised visitation with the children "contingent upon clean drug/alcohol screens and the parents not being incarcerated."

¶ 5 At the time of the ninety-day review hearing, respondent-mother was homeless and unemployed, but had entered into an Out-of-Home Family Services Agreement (OHFSA) with YCHSA on 17 October 2017 aimed at addressing issues of mental health, substance abuse, and parenting skills. Respondent-father was also homeless and claimed to be employed but had not provided proof of his employment. Respondent-father refused to sign an OHFSA but orally agreed to submit to substance abuse and mental health assessments and to complete parenting classes. The trial court noted that both respondents were attending visitations with the

children, and respondents behaved appropriately during these interactions. In its review order entered on 25 January 2018, the trial court identified the following barriers to reunification:

> (1) [respondent-mother] is currently working through the requirements of her OHFSA; (2) [respondent-father] has not entered into an OHFSA with the YCHSA but needs to continue working through the items he orally agreed to complete; (3) the parents need to acquire suitable housing; and (4) one or both parents need to provide proof of an established means to support the minor children.

¶ 6        The trial court held an initial permanency planning hearing on 14 June 2018 and entered an order on 13 July 2018 in which it established a primary permanent plan of reunification for Ben and John with a secondary plan of guardianship with a relative or other approved caregiver. Reunification remained the children's primary permanent plan until a permanency planning order was entered on 7 March 2019, in which the trial court found that, despite YCHSA making reasonable efforts to support a primary plan of reunification, both respondents had failed to "mak[e] adequate progress within a reasonable period of time" on their respective plans which were designed to eliminate the barriers to reunification between the children and respondents. The trial court changed the primary permanent plan to guardianship with a secondary plan of adoption and relieved YCHSA "of any obligation to make further reasonable efforts to reunify the respondents with the minor children."

¶ 7        Following a permanency planning hearing on 30 May 2019, the trial court

changed the primary permanent plan to adoption with a secondary plan of guardianship and ordered YCHSA to initiate termination of parental rights proceedings. On 13 June 2019, YCHSA moved the children into a potential adoptive placement with licensed foster parents. YCHSA filed a motion to terminate respondents' parental rights to Ben and John on 8 August 2019, in which the agency asserted two statutory grounds for termination: (1) that respondents had neglected the children and that there was a substantial likelihood of future neglect if the children were returned to their custody pursuant to N.C.G.S. § 7B-1111(a)(1); and (2) that respondents had willfully left the children in a placement outside the home for more than twelve months without making reasonable progress to correct the conditions leading to their removal pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 8 Prior to the hearing on the motion to terminate parental rights, the trial court granted respondent-father's motion to bifurcate the adjudication and disposition phases of the proceedings. The adjudicatory hearing concluded on 7 February 2020, and the trial court announced that it found "by clear and convincing evidence that grounds exist for the termination of the parental rights" of both respondents for neglect and failure to make reasonable progress under N.C.G.S. § 7B-1111(a)(1) and (2). After rendering its adjudication, the trial court elected to "go forward with the disposition phase" and heard from YCHSA's witnesses as to disposition before adjourning for the day. The trial court reconvened the parties on the morning of 15

June 2020 to complete the dispositional hearing. At the conclusion of the hearing, the trial court considered each of the statutory dispositional factors contained within N.C.G.S. § 7B-1110(a) before concluding that it was in the best interests of both children to terminate the parental rights of each respondent.

¶ 9 On 29 June 2020, the trial court entered its order terminating the parental rights of respondent-mother and respondent-father. Consistent with its adjudication rendered in open court on 7 February 2020, the trial court concluded that YCHSA had proven the existence of both of its alleged grounds for termination—neglect and failure to make reasonable progress—by clear, cogent, and convincing evidence. For its disposition under N.C.G.S. § 7B-1110(a), the trial court memorialized its conclusion that it was in the best interests of Ben and John that respondents' parental rights be terminated. Both respondents filed timely notices of appeal from the termination of parental rights order.

## II. Analysis

¶ 10 Although respondent-mother and respondent-father filed separate appellate briefs, each of them challenge only the trial court's adjudication of grounds for terminating their respective parental rights under N.C.G.S. § 7B-1111(a)(1)–(2). Neither respondent contests the trial court's dispositional assessment of the children's best interests under N.C.G.S. § 7B-1110(a).

¶ 11 We review the trial court's adjudication under N.C.G.S. § 7B-1111(a)

to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. Unchallenged findings of fact are deemed supported by competent evidence and are binding on appeal. Moreover, we review only those findings needed to sustain the trial court's adjudication.

The issue of whether a trial court's findings of fact support its conclusions of law is reviewed de novo. However, an adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order. Therefore, if this Court upholds the trial court's order in which it concludes that a particular ground for termination exists, then we need not review any remaining grounds.

*In re J.S.*, 374 N.C. 811, 814–15 (2020) (extraneity omitted).

¶ 12    Because the determination of the existence of any statutory ground which is duly supported is sufficient to sustain a termination order, we elect to review the trial court's adjudication under N.C.G.S. § 7B-1111(a)(2), which authorizes the termination of parental rights if "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." This Court has explained that

a finding that a parent acted willfully for purposes of N.C.G.S. § 7B-1111(a)(2) does not require a showing of fault by the parent. A respondent's prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness regardless of her good intentions, and will support a finding of lack of

progress sufficient to warrant termination of parental rights under section 7B-1111(a)(2).

*In re J.S.*, 374 N.C. at 815 (extraneity omitted).

¶ 13    The trial court placed Ben and John in YCHSA custody pursuant to the adjudication of neglect and resulting disposition entered on 11 October 2017. Therefore, the children had been in a YCHSA placement outside of the parental home for nearly twenty-two months at the time that the motion to terminate respondents' parental rights was filed in August 2019. This passage of time exceeds the twelve-month requirement established in N.C.G.S. § 7B-1111(a)(2). *See id.* (noting that the juvenile must have been placed "outside the home pursuant to a court order for more than a year at the time the petition to terminate parental rights is filed." (extraneity omitted)). In assessing the reasonableness of respondents' progress in correcting the conditions which resulted in the removal of the children from their care, however, we consider their performance "for the duration leading up to the hearing on the motion or petition to terminate parental rights." *Id.* (citation omitted).

## A. Respondent-Mother's Appeal

### 1. Findings of fact

¶ 14    Respondent-mother challenges many of the trial court's findings of fact, contending that they are either erroneous or otherwise unsupported by the evidence. The trial court made the following findings addressing respondent-mother's progress after the children entered YCHSA custody:

20. Respondent Mother entered into an Out of Home Family Services Agreement (hereinafter "Case Plan") with YCHSA on October 17, 2017. The components of Respondent Mother's Case Plan were: to successfully complete substance abuse treatment and refrain from abusing any substances; to undergo a psychological assessment and follow all recommendations; obtain and maintain stable housing and employment for she [sic] and her children; complete parenting classes; and visitation with her children.

21. Respondent Mother went to Ann Adams for an initial substance abuse assessment on January 27, 2018. She reported that she had not used drugs since 09/27/2017. However, she tested positive for Amphetamines and Methamphetamines . . . on January 27, 2018. Respondent Mother then cancelled or no-showed on multiple follow up appointments . . . . On April 30, 2018, Adams wrote YCHSA that Respondent Mother needed Substance Abuse Intensive Outpatient Therapy to address her stimulant use. As of February 4, 2020, Respondent Mother had not returned to Adams for any therapy to address her addiction.

22. Respondent Mother went to Daymark for a Comprehensive Clinical Assessment on May 14, 2018. The diagnosis was amphetamine type substance abuse disorder-severe; opioid use disorder severe in early remission; general anxiety disorder; major depressive disorder. Respondent Mother tested positive for amphetamines at the Daymark assessment on May 14, 2018. She was recommended to engage in their long term recovery group beginning on May 24, 2018.

23. Respondent Mother went to Daymark for treatment in May, and some in July of 2018. She did not return to Daymark until the end of October, 2018, when

they made her take another assessment because of the lapse of time. She then went one more time on 11/07/2018, and has not been back to Daymark since. Respondent Mother failed to successfully complete the substance abuse treatment she was recommended to do by two different clinicians.

24. The Respondent Mother tested positive for illegal substances or refused to screen on eight out of twelve screens attempted by YCHSA on her including testing positive for Methamphetamine and Amphetamine on May 21, 2019, and she refused a screen on January 17, 2020, the last two drug screens attempted on her.

25. Respondent Mother did attend a Psychological assessment with Chris [Sheaffer], Ph. D., Psychologist with Tri-Care, P.A., on December 19, 2017[.]

26. Respondent Mother reported severe substance abuse including opioids and stimulants since prior to the birth of her first child.

27. Dr. [Sheaffer] diagnosed Respondent Mother as having severe untreated substance abuse issues and indicated she needed intensive outpatient treatment. He also diagnosed her with generalized anxiety disorder and recommended mental health treatment. Respondent Mother failed to follow any of the recommendations from Dr. [Sheaffer].

28. During the period [the juveniles] have been in the custody of YCHSA, Respondent Mother has provided proof of employment with Papa John's Pizza for approximately seven weeks during 2018. Besides that, she has not provided proof of any gainful employment.

29. Respondent Mother has not had stable housing. She and Respondent Father did have an apartment in

Yadkinville with HUD assistance in 2018 until July, 2019, when she was taken off the lease. Respondent Father violated his HUD contract and lost the apartment in October of 2019. Respondent Mother has refused to provide her current address to YCHSA. Since at least the beginning of May, 2020, Respondent Mother has lived in a motel room with Respondent Father.

30.     Respondent Mother did complete parenting classes and she did visit regularly.

. . . .

49.     Respondent Mother never finished her substance abuse treatment and tested positive for illicit substances on a majority of the drug screens, including the last ones given to her where she either tested positive or refused to screen, which the [c]ourt deems a positive screen. She has made no improvement on her substance abuse issues from the date of the initial adjudication on September 14, 2017, to the present.

. . . .

52.     Respondent Mother took a psychological evaluation but failed to follow the recommendations.

¶ 15     The trial court also made several findings of fact addressing respondents' collective progress, as follows:

42.     Neither the Respondent Mother nor the Respondent Father availed themselves of the opportunities and services to obtain permanence and stability for themselves and their children.

43.     The Respondent Mother and the Respondent Father had the opportunity to correct the conditions that led to the removal of their children from their care, but

the parents failed to do so.

44. The [c]ourt finds that Respondent Parents' actions were willful.

. . . .

48. The conditions which caused the children to be adjudicated as neglected juveniles in September, 2017, and for which the children came into custody for; [sic] substance abuse by the parents and overall instability in housing and employment, still exist. . . .

. . . .

51. Both Respondent Parents have been homeless, living with friends or in motel rooms for the majority of the time the juveniles have been in YCHSA custody, and are currently living in a room in the Welborn Motel.

. . . .

53. Though the Parents did complete parenting classes and have visited regularly, this is extremely limited progress on their case plans and not reasonable progress.

54. The Respondent Parents did not make adequate progress in a reasonable time under their case plans.

¶ 16    We begin by addressing respondent-mother's claim that certain findings of the trial court are unsupported by the evidence because the trial court heard evidence of her actions only up to the first day of the termination hearing on 7 February 2020, which failed to account for respondent-mother's progress between 7 February 2020 and the conclusion of the dispositional hearing on 15 June 2020. Since N.C.G.S. § 7B-

1111(a)(2) requires an evaluation of the parent's progress "for the duration leading up to the hearing on the motion or petition to terminate parental rights[,]" *In re J.S.*, 374 N.C. at 815, respondent-mother contends that Findings of Fact 24, 27, 42, 43, 49, and 52 are erroneous inasmuch as YCHSA adduced "no evidence at all of what [respondent-mother] did or did not do . . . between February 7, 2020 and June 15, 2020."

¶ 17        We are not persuaded by respondent-mother's argument. It is well-established that

> [t]he termination of a parent's parental rights in a juvenile matter is a two-stage process consisting of an adjudicatory stage and a dispositional stage. *See* N.C.G.S. §[§] 7B-1109, -1110 (2019). "If during the adjudicatory sta[g]e, the trial court finds grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must determine whether terminating the parent's rights is in the juvenile's best interest."

*In re C.B.*, 375 N.C. 556, 559 (2020) (quoting *In re J.J.B.*, 374 N.C. 787, 791 (2020)). Although we have held that "a trial court is *not required to bifurcate the hearing* into two distinct stages[,]" *In re S.M.M.*, 374 N.C. 911, 915 (2020) (emphasis added), a trial court may exercise its discretion to hold separate adjudicatory and dispositional hearings in accordance with N.C.G.S. §§ 7B-1109 and 7B-1110.

¶ 18        In this case, respondent-father moved the trial court prior to the termination proceedings "that this matter be bifurcated into separate hearings regarding the adjudication and disposition." Hearing no objection, the trial court allowed the motion

and announced, "It will be bifurcated." On 7 February 2020, the trial court concluded the adjudicatory stage of the proceedings and stated its ruling that YCHSA had proven the existence of grounds to terminate respondents' parental rights under N.C.G.S. § 7B-1111(a)(1) and (2), before conducting a portion of the dispositional hearing by receiving testimony from two YCHSA witnesses on the issue of the children's best interests. No objection was lodged concerning this procedure, notwithstanding the trial court's earlier assent to respondent-father's request to bifurcate the proceedings.

¶ 19    When the parties reconvened on 15 June 2020, the trial court reviewed the status of the proceedings as follows:

> When we last left, the adjudication phase had been completed. We did in fact complete the adjudication phase, and I did find that there were grounds to exist for the termination of parental rights. And we had briefly gone into the disposition phase, and I believe [YCHSA] had presented your evidence on disposition.

Respondent-mother did not object to the trial court's characterization of the posture of the case. Nor did respondent-mother move to reopen the adjudicatory stage of the hearing for additional evidence or findings. While it is true, as respondent-mother observes, that "the termination hearing was not concluded until June 15, 2020," the transcript shows that the trial court concluded the adjudicatory portion of the hearing on 7 February 2020, and it did so with the full knowledge and consent of the parties.

¶ 20    The procedure that an adjudication under N.C.G.S. § 7B-1111(a)(2) requires

the trial court and reviewing appellate courts to consider concerning the parent's progress "up to the hearing" date refers to the date of the *adjudicatory hearing* in cases where the proceedings are bifurcated, and necessarily precludes the requirement for the trial court to consider progress achieved by the parent which is made after the commencement of the proceedings. *In re J.S.*, 374 N.C. at 815. To conclude otherwise would effectively bar the trial court from scheduling sequential adjudicatory and dispositional hearings on different dates or, at a minimum, would require the trial court to save a portion of the adjudicatory hearing for the final day of the termination proceedings in the event that a parent happens to produce some evidence of the parent's claimed progress which was achieved between hearing dates. Such a result is inconsistent with the statutory framework established by N.C.G.S. §§ 7B-1109 and 7B-1110 and is not otherwise compelled by our case law.

¶ 21      Respondent-mother also emphasizes that there was no "order adjudicating grounds for termination entered before June 29, 2020." To the extent respondent-mother implies that YCHSA was obliged to prove her lack of reasonable progress up to the date of entry of the termination order, we do not agree. If such a requirement prevailed, then a movant or petitioner would fail to meet its burden of proof if the trial court did not enter its written order on the date of the hearing. Subsection 7B-1109(e) expressly provides the trial court a period of thirty days "following the completion of the termination of parental rights hearing" in which to enter the

adjudicatory order. N.C.G.S. § 7B-1109(e) (2019). Therefore, N.C.G.S. § 7B-1111(a)(2) cannot be construed to require proof of the parent's progress, or lack thereof, as of the order's entry date.

If respondent-mother had wanted the trial court to receive additional evidence with regard to the adjudication phase on 15 June 2020—after the trial court had formally concluded the adjudicatory stage of the proceedings and had announced its ruling on 7 February 2020—it was incumbent upon respondent-mother to move to reopen the matter for the presentation of new evidence. *Cf. In re S.M.M.*, 374 N.C. at 915 ("Mere speculation that some facts may have changed in the eighteen months since the court originally heard the evidence is not sufficient to demonstrate that the trial court abused its discretion in denying respondent's motion to reopen the evidence on remand."). As respondent-mother did not move to reopen the adjudicatory stage of the proceedings, we overrule her exceptions to Findings of Fact 24, 27, 42, 43, 49, and 52 to the extent that they are based on the absence of evidence about her progress between 7 February 2020 and 15 June 2020.

Respondent-mother also makes individualized evidentiary challenges to a number of the trial court's findings. For the reasons discussed below, we conclude that respondent-mother fails to show any prejudicial error in the trial court's findings of fact.

In contesting Finding of Fact 24, respondent-mother asserts that the trial court

heard no evidence that she "refused" a drug screen on 17 January 2020. YCHSA social worker Karen Wheeler testified that respondent-mother "was given a screen" on 17 January 2020, "but that screen was never returned." When asked to confirm that respondent-mother "did not take the screen" requested on 17 January 2020, Ms. Wheeler replied: "She did not take it. That's correct." Ms. Wheeler further recounted that the terms of respondent-mother's OHFSA, which was admitted into evidence without objection, provided that "[i]f [she] fails to complete a drug screen or attempts to alter a drug screen, the result will be recorded as a positive result." This testimony supports a reasonable inference on the part of the trial court that respondent-mother's unexplained failure to return the drug screen which was given to her on 17 January 2020 amounted to a refusal to submit to the screen. *See In re J.M.J.-J.*, 374 N.C. 553, 560 (2020); *see also In re T.N.H.*, 372 N.C. 403, 411 (2019) (recognizing trial court's "duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony").

¶ 25 Respondent-mother challenges as "partially erroneous" the trial court's Findings of Fact 27 and 52, which portray her as "fail[ing] to follow any of the recommendations from Dr. [Sheaffer]" in his psychological evaluation dated 19 December 2017. In support of her assertion, respondent-mother submits that she completed parenting classes on 21 December 2017 as confirmed by Ms. Wheeler's testimony.

We are not persuaded, however, by respondent-mother's position. Dr. Sheaffer's written evaluation, which was admitted into evidence at the hearing, states that respondent-mother "reported that she is currently participating in parenting classes." Dr. Sheaffer made treatment recommendations to address respondent-mother's substance abuse and mental health issues. Respondent-mother does not deny the trial court's finding that she had failed to comply with these recommendations at the time of the adjudicatory hearing on 7 February 2020.

As for the recommendation that respondent-mother claims to have satisfied in contradiction of the trial court's findings, the record reflects that Dr. Sheaffer "recommend[ed] that increased caregiving responsibilities for [respondent-mother's] children be provided to her based on continued abstinence from substances, completion of parenting classes, and indication of more stable living circumstances." We understand that this is not an unequivocal recommendation for respondent-mother to attend parenting classes, but merely a recognition on Dr. Sheaffer's part that respondent-mother would benefit from "increased caregiving responsibilities" *so long as* she accomplished certain prerequisites which included the completion of parenting classes. Assuming, *arguendo*, that Findings of Fact 27 and 52 erroneously fail to credit respondent-mother with satisfying one of Dr. Sheaffer's recommendations, we conclude that such error, taken in context, is harmless. *See In re S.M.*, 375 N.C. 673, 684 (2020) (disregarding erroneous portion of adjudicatory

finding not supported by the evidence). Since Findings of Fact 30 and 53 fully and expressly recognize that respondent-mother completed her parenting classes, we are assured that the trial court thoroughly evaluated the evidence in arriving at its findings concerning respondent-mother's compliance with Dr. Sheaffer's recommendations. Therefore, this exception is overruled.

¶ 28    Next, respondent-mother challenges Findings of Fact 42 and 44 as "erroneous . . . due to . . . vagueness." With regard to Finding of Fact 42, respondent-mother contends that the trial court did not explain how respondent-mother failed to "avail" herself of any specific "opportunities and services to obtain permanence and stability." As to Finding of Fact 44, respondent-mother argues that the trial court failed to identify which of her "actions were willful." We find respondent-mother's claims of vagueness, and her resulting parallel to commissions of error, to be unfounded.

¶ 29    A review of the termination order shows that Findings of Fact 20 through 30 particularize the requirements of respondent-mother's OHFSA and describe in detail her lack of progress in addressing the substance abuse, mental health, housing, and employment components of the agreement. Findings of Fact 31 through 41 provide a similar recitation in addressing specific details regarding respondent-father. Findings of Fact 42 through 44 represent the trial court's summation of both respondents' overall performance in pursuit of their requirements as set forth in

findings 20 through 41. The reference to "opportunities and services" in Finding of Fact 42 refers to the mental health and substance abuse services offered to respondent-mother by YCHSA and her treatment providers, as well as the employment opportunity identified in Finding of Fact 28 and the "apartment in Yadkinville with HUD assistance" mentioned in Finding of Fact 29. The extent to which respondent-mother did not avail herself of these opportunities and services is demonstrated by her failure to complete substance abuse or mental health treatment as depicted in Findings of Fact 21 through 23, 25, and 27; by her continued positive drug screens described in Finding of Fact 24; by her limited time span of seven weeks of employment as reflected in Finding of Fact 28; and by her loss of subsidized housing in July 2019 "when she was taken off the lease" as recounted in Finding of Fact 29.

¶ 30        Read in the context of Findings of Fact 24 and 28, the trial court's determination that respondent-mother's "actions were willful" in Finding of Fact 44 refers to both respondent-mother's failure to avail herself of the "opportunities and services to obtain permanence and stability" recognized in Finding of Fact 42 and her failure "to correct the conditions that led to the removal of the[ ] children from [her] care" as stated in Finding of Fact 43.[3] Although respondent-mother does not challenge

---

[3] Respondent-mother also challenges the evidentiary basis of Finding of Fact 43 contending that there is a dearth of information in the record regarding any progress made between the February 2020 adjudicatory hearing and the June 2020 dispositional hearing. As previously discussed, the trial court was under no duty to consider respondent-mother's progress beyond a date "up to the hearing on the motion or petition to terminate parental

the evidentiary support for Finding of Fact 44 aside from her contention that its vagueness renders the finding erroneous, the evidence of respondent-mother's persistent failure to complete the treatment protocols established by her evaluators or to otherwise address the requirements of her OHFSA over a substantial period of time gives rise to a reasonable determination by the trial court that respondent-mother's actions were willful. *See In re J.S.*, 374 N.C. at 815 (stating that a parent's "prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness . . . under section 7B-1111(a)(2)" (citation omitted)). Accordingly, we uphold Findings of Fact 42 and 44 as sufficiently specific to support the trial court's adjudication.

¶ 31     Respondent-mother subsequently challenges Finding of Fact 49, asserting that "no competent evidence" supports the trial court's finding that she "made no improvement on her substance abuse issues from the date of the initial adjudication on September 14, 2017, to the present." As previously discussed, we construe "the present" to mean at the time of the adjudicatory hearing on 7 February 2020.

¶ 32     We find no merit to respondent-mother's claim. The evidence and the trial court's uncontested findings show that respondent-mother "failed to successfully

---

rights," which fell on 7 February 2020. *In re J.S.*, 374 N.C. 811, 815 (2020). Therefore, respondent-mother cannot successfully maintain such a challenge based upon a trial court's alleged failure to consider evidence which it was under no duty to consider. Respondent-mother's contention on this matter is without merit.

complete the substance abuse treatment she was recommended to do by two different clinicians" and that she did not engage in any treatment at all after 7 November 2018. During the course of the case, respondent-mother "tested positive for illegal substances or refused to screen on eight out of twelve screens attempted by YCHSA." Moreover, respondent-mother "test[ed] positive for Methamphetamine and Amphetamine on May 21, 2019, and she refused a screen on January 17, 2020, the last two drug screens attempted on her." Ms. Wheeler relayed to the trial court in her testimony that respondent-mother "has not made any progress" on the substance abuse component of her OHFSA. Although respondent-mother reiterates her unpersuasive argument that her failure to provide the drug screen requested by YCHSA on 17 January 2020 "is *not* the equivalent of a positive drug screen[,]" nonetheless respondent-mother was definitively on notice as a condition of her OHFSA that a refused drug screen would be "recorded as a positive result." The trial court thus could reasonably infer that respondent-mother's unexplained failure to submit to the requested drug screen amounted to an admission that the test's result would be inculpatory. Contrary to respondent-mother's assertion, the fact that YCHSA did not request a drug screen from her in the eight months between May 2019 and January 2020 does not undermine the trial court's finding that respondent-mother had made no progress at the time of the 7 February 2020 hearing.

¶ 33    Finally, respondent-mother challenges Finding of Fact 53, which characterizes

respondents' completion of parenting classes and consistent attendance at visitations with Ben and John as "extremely limited progress on their case plans and not reasonable progress[,]" as well as Finding of Fact 54, which states that respondents "did not make adequate progress in a reasonable time under their case plans." Respondent-mother contends that these findings are "unsupported by clear, cogent and convincing evidence, are largely conclusory in nature and are unsupported by proper findings."

¶ 34        We again find respondent-mother's objections to be without foundation. In addition to parenting classes and visitation, respondent-mother's OHFSA required her to address the issues of substance abuse, mental health, housing, and employment. The hearing testimony and the trial court's unchallenged findings show that after completing parenting classes in December 2017, respondent-mother failed to comply with the treatment recommendations of the psychological evaluation completed by Dr. Sheaffer on 19 December 2017, the substance abuse assessment prepared by Ann Adams at Professional Assessment Counseling Center on 30 April 2018, and the Comprehensive Clinical Assessment performed at Daymark on 14 May 2018. Respondent-mother either refused to participate in or tested positive on most of the twelve drug screens requested by YCHSA, including the two most recent screens prior to the termination hearing. At the time of the 7 February 2020 adjudicatory hearing, respondent-mother had not participated in any substance

abuse treatment for almost fifteen months, had lacked stable housing since October 2019, and had remained unemployed since 2018. As respondent-mother failed to complete any component of her case plan aside from parenting classes and visitation with the children in the almost twenty-seven months between 17 October 2017 and 7 February 2020, the trial court did not err in deeming the progress of respondent-mother on her case plan to be "extremely limited," "not reasonable," and inadequate for the purposes of responding to YCHSA's allegation that respondent-mother had failed to make reasonable progress in correcting the conditions which resulted in her children's removal from the home.

### 2. *Conclusion of law*

¶ 35    Respondent-mother also challenges the trial court's conclusion that grounds existed to terminate her parental rights because she "willfully left the juveniles in foster care or placement outside the home for more than twelve months without showing to the satisfaction of the [c]ourt that reasonable progress under the circumstances was made in correcting those conditions which led to the removal of the juveniles." We hold that the trial court's valid findings of fact amply support this conclusion.

¶ 36    Ms. Wheeler testified at the termination of parental rights hearing that the primary conditions leading to the removal of Ben and John from the home were respondent-mother's substance abuse and lack of stable housing and employment.

The trial court's findings of fact show that respondent-mother made only extremely limited progress in remedying these conditions over the span of more than twenty-eight months which transpired since the initial adjudication of neglect. Respondent-mother's "extremely limited progress" over such an extended period supports a conclusion that she willfully failed to make reasonable progress within the meaning of N.C.G.S. § 7B-1111(a)(2). *In re S.M.*, 375 N.C. at 685 (quoting *In re B.O.A.*, 372 N.C. 372, 385 (2019)); *see also In re Z.O.G.-I.*, 375 N.C. 858, 867 (2020). Because we uphold the adjudication under N.C.G.S. § 7B-1111(a)(2), we do not consider respondent-mother's arguments challenging the adjudication under N.C.G.S. § 7B-1111(a)(1). *See In re J.S.*, 374 N.C. at 815. We therefore affirm the trial court's order terminating respondent-mother's parental rights to Ben and John.

## B. Respondent-Father's Appeal

### 1. *Findings of fact*

Respondent-father challenges the trial court's adjudication of the existence of grounds under N.C.G.S. § 7B-1111(a) through his assertion that "[c]ritical [f]indings of [f]act . . . are unsupported by clear, cogent, and convincing evidence or are so vague as to lack any value to support a conclusion of law."[4] As with respondent-mother's

---

[4] Respondent-father includes his objections to the trial court's findings of fact in section I of his appellant's brief, which challenges the trial court's adjudication of neglect under N.C.G.S. § 7B-1111(a)(1). Section II of the brief presents respondent-father's argument challenging the adjudication of lack of reasonable progress under N.C.G.S. § 7B-1111(a)(2). Section II neither repeats nor incorporates by reference any of respondent-father's exceptions to the trial court's findings raised in section I. Nevertheless, we review the findings of fact

appeal, we limit our review to the adjudication of respondent-father's willful failure

to make reasonable progress under N.C.G.S. § 7B-1111(a)(2).

¶ 38         The trial court made the following findings of fact about respondent-father's

circumstances regarding his involvement in this case which are germane to this

Court's consideration of the trial court's adjudication:

> 31.    Respondent Father was presented an Out of Home Family Services Agreement (hereinafter "Case Plan") with YCHSA on October 27, 2017. The Social Worker went over the Case Plan with Respondent Father but he refused to sign. The components of Respondent Father's case plan was [sic]: obtain a substance abuse assessment and follow recommendations and submit to random drug screens; obtain a Psychological Assessment and follow all recommendations; obtain and maintain stable housing and employment for he [sic] and his children; complete parenting classes; and visitation with his children.
>
> 32.    Respondent Father was sent to Ann Adams for a substance abuse assessment in December of 2017. Respondent Father went to the initial meeting, and was asked to come back and participate in a drug screen. Though he promised Adams on multiple occasions he never showed for a screen. As such, Adams was unable to complete the assessment and provide any recommendations.
>
> 33.    Respondent Father never obtained a substance abuse assessment during the entire time his children were in YCHSA custody.
>
> 34.    Respondent Father tested negative on three drug

challenged by respondent-father in section I of his brief insofar as the findings support the contested adjudication under N.C.G.S. § 7B-1111(a)(2).

screens in 2017, and tested negative on the two drug screens given him in 2018. Respondent Father refused to screen on May 6, 2019, and then tested positive for Methamphetamine and Amphetamine on May 21, 2019. Respondent Father also refused a drug test offered on January 17, 2020.

35. Respondent Father failed to take advantage of YCHSA setting up two different appointments with Dr. Chris [Sheaffer] to perform a psychological evaluation . . . as part of his case plan. Respondent Father failed to attend either appointment. Respondent Father indicated to YCHSA that he wanted to go to the Epilepsy Institute in Winston-Salem, NC to complete his psychological evaluation so YCHSA wrote to the Epilepsy Institute and made a referral for Respondent Father to get a psychological evaluation there. Respondent Father never attended a psychological [evaluation] with the Epilepsy Institute either.

36. Prior to the filing of the Motion for TPR in August, 2019, Respondent Father had failed to attend a psychological evaluation, despite YCHSA setting up numerous appointments for him to do so with two different providers.

37. On November 5, 2019, Respondent Father did go for a psychological evaluation from Carol Pulley . . . . Respondent Father did not tell YCHSA that he was going to Pulley for the evaluation and Pulley did not have the benefit of any YCHSA records or reports to review in doing her evaluation. The [c]ourt specifically finds that Respondent Father was not truthful . . . as he did not report any substance abuse history to Pulley despite having tested positive for Methamphetamine and Amphetamine in May, 2019.

38. Pulley diagnosed Respondent Father with major depressive disorder, somatic symptom disorder, and generalized anxiety disorder. She recommended

Cognitive Behavioral Therapy, interpersonal therapy, psychotherapy, and medication management for treatment of his mental health diagnosis. As of June 15, 2020, Respondent Father had not begun any of the therapy or treatments recommended by Pulley.

39.     Respondent Father has not had stable housing during the pendency of the juveniles being in YCHSA custody. He . . . did have an apartment in Yadkinville with HUD assistance in 2018 until Respondent Father violated his HUD contract and lost the apartment in October of 2019. Besides that time period, Respondent Father has reported he lived with friends in Wilkesboro or Hamptonville, and in various motel rooms with Respondent Mother from early May, 2020 up and through June 15, 2020.

40.     Respondent Father has no stable employment at the time of the hearing and has not for the vast majority of the case. Respondent Father indicated he has partial disability from military service which provides him $500.00 . . . per month. However, he has not had gainful employment since 2018.

41.     Respondent Father did complete parenting classes, and did visit regularly with the juveniles.

        . . . .

50.     Respondent Father never even completed a substance abuse assessment and has tested positive or refused the last two drug screens given him in 2019 and 2020.

51.     Both Respondent Parents have been homeless, living with friends or in motel rooms for the majority of the time the juveniles have been in YCHSA custody, and are currently living in a room in the Welborn Motel.

> 52. . . . Respondent Father failed to take a psychological evaluation until November, 2019, over two years after the children were taken into custody. As of June 15, 2020, he still had not acted on any of the recommendations from his evaluation.

To the extent that respondent-father does not challenge these findings, they are binding. *In re J.S.*, 374 N.C. at 814.

¶ 39 Respondent-father claims that the evidence in the record does not support the trial court's determinations in Findings of Fact 33 and 50 that he never obtained or completed a substance abuse assessment. Respondent-father argues that these findings are contradicted by the trial court's permanency planning orders entered in the underlying juvenile proceedings, which include findings that he "completed a substance abuse assessment at Daymark Recovery Services on or about June 5, 2018" and that "[h]is substance abuse assessor did not recommend any follow-up treatment." He further notes that the trial court expressly "took judicial notice of all prior juvenile pleadings and [c]ourt orders" entered in the previous neglect proceedings.

¶ 40 Ms. Wheeler testified at the termination of parental rights hearing that respondent-father was referred to Ms. Adams at Professional Assessment Counseling Center for a substance abuse assessment in December 2017, and that he attended the first day of the assessment but failed to return for the second appointment required to complete the assessment. Because respondent-father never attended the second

assessment session with Ms. Adams, she was unable to make any treatment recommendations. The trial court admitted into evidence a letter from Ms. Adams dated 30 April 2018, confirming her inability to complete respondent-father's substance abuse assessment due to his multiple cancellations and nonattendance of scheduled appointments. Ms. Wheeler further testified that, to her knowledge, respondent-father never completed a substance abuse assessment or sought any form of treatment for substance abuse.

¶ 41          Respondent-father acknowledged in his testimony at the termination of parental rights hearing that he failed to complete his assessment with Ms. Adams, but also testified that he completed a substance abuse assessment at Daymark on 5 June 2018. Respondent-father's testimony was reflected in the trial court's findings of fact in five permanency planning orders entered between 13 July 2018 and 12 November 2019. Such testimony of respondent-father is also referenced in the written reports which YCHSA submitted to the trial court for four of those permanency planning hearings. At the hearing, Ms. Wheeler was not cross-examined about any discrepancy between YCHSA's prior written reports and her testimony that respondent-father had not completed a substance abuse assessment. Asked generally whether YCHSA had "been provided with any information from [respondent-father] or otherwise that he attended Daymark for substance abuse *treatment*[,]" Ms. Wheeler replied, "I have not." (Emphasis added.)

¶ 42          Generally, where there is conflicting witness testimony on an issue of fact, it is

the trial court's "responsibility to pass upon the credibility of the witnesses and the

weight to be given their testimony and the reasonable inferences to be drawn

therefrom." *In re D.L.W.*, 368 N.C. 835, 843 (2016) (extraneity omitted). Absent some

documentation or other proof of respondent-father's substance abuse assessment at

Daymark, the trial court was authorized as the trier of fact to believe Ms. Wheeler's

testimony and to disbelieve the testimony of respondent-father. The fact that the trial

court took judicial notice of its permanency planning orders in the underlying juvenile

file does not preclude the trial court from making a credibility determination in favor

of Ms. Wheeler rather than respondent-father in resolving conflicts in their respective

testimonial accounts. The findings made in a permanency planning order are not

binding upon a trial court at a subsequent termination proceeding. Unlike a

permanency planning hearing under N.C.G.S. § 7B-906.1(c), the adjudicatory stage

of a termination hearing is governed by the formal rules of evidence.[5] N.C.G.S. § 7B-

1109(f). Moreover, findings made for permanency planning purposes are not subject

to the heightened "clear, cogent, and convincing evidence" standard of proof that

applies to adjudicatory findings under N.C.G.S. § 7B-1109(f). *See In re L.E.W.*, 375

---

[5] Dispositional reports like those submitted by YCHSA at the permanency planning hearings are inadmissible at the adjudicatory stage of a juvenile abuse, neglect, or dependency proceeding, which is likewise governed by the rules of evidence in civil cases. N.C.G.S. §§ 7B-804, 7B-808(a) (2019).

N.C. 124, 127–28 (2020) (concluding that the trial court "erroneously stated in the challenged permanency planning order that . . . 'the following findings of fact have been proven by clear, cogent, and convincing evidence' " because "the trial court's findings of fact need only be supported by sufficient competent evidence" (quoting *In re L.M.T.*, 367 N.C. 165, 180 (2013))).

¶ 43        This Court has authorized trial courts to "take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard because where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence." *In re J.M.J.-J.*, 374 N.C. at 558 (quoting *In re T.N.H.*, 372 N.C. at 410). We have treated such prior findings of fact as sufficient to support an adjudicatory finding of fact under N.C.G.S. § 7B-1109(f). *Id.* (concluding that the trial court's finding that respondent tested positive for hydrocodone and oxycodone was "supported by a permanency planning order . . . which found as a fact that respondent tested positive for hydrocodone and oxycodone[,]" even though the witness attested only to respondent's "positive drug screen"). *But cf. State v. Dula*, 204 N.C. 535, 536 (1933) ("It is generally held that 'a judgment in a civil action is not admissible in a subsequent criminal prosecution' . . . . [I]t would not be just to convict a defendant . . . by reason of a judgment obtained against him in a civil action by a mere preponderance of evidence."). This Court continues to recognize the deference which

is to be accorded to a trial court in reconciling conflicts in the evidence which is provided to it, including the assessment of its prior findings in a permanency planning order and the testimony of a live witness at the termination hearing, in a trial court's determination of witness credibility and resulting findings of fact.[6]

¶ 44    In light of the trial court's authority to resolve conflicts in the evidence, *see In re T.T.E.*, 372 N.C. 413, 420 (2019), we view Ms. Wheeler's testimony that respondent-father failed to complete a substance abuse assessment as sufficient support for Findings of Fact 33 and 50, notwithstanding the existence of contrary evidence in the record.

¶ 45    Respondent-father next challenges portions of Finding of Fact 37 concerning the psychological evaluation he obtained from Carol Pulley on 5 November 2019. Specifically, he claims that the trial court erred in finding that Ms. Pulley "did not have the benefit of any YCHSA records or reports to review in doing her evaluation" and that he "was not truthful" with Ms. Pulley because "he did not report any

---

[6] We note that respondent-father's attorney objected to the trial court taking judicial notice of its prior orders, citing "the different levels of evidence and the different standards that are applied to certain orders" and specifically argued that, "[i]n the permanency planning hearings and review hearings, obviously, there's a laxer standard for the Rules of Evidence." YCHSA responded that respondent-father's objection "goes more to the weight to be given [to] the evidence, not to its admissibility." YCHSA's attorney maintained that the trial court was entitled to "take judicial notice of the underlying proceedings, giving to each particular order or document its appropriate weight, taking into consideration the varying standards of proof that may have governed a particular hearing at which a document was generated." The trial court agreed with YCHSA's understanding of the relevant law and overruled respondent-father's attorney's objection.

substance abuse history."

¶ 46 We determine that the evidence in the record supports Finding of Fact 37. Ms. Wheeler testified that YCHSA originally referred respondent-father to TriCare Mental and Behavioral Health Services for a psychological evaluation, but respondent-father failed to attend the appointment. In October 2018, YCHSA made another referral for respondent-father to obtain the psychological evaluation at the Epilepsy Institute of North Carolina. Social worker Valerie Hamilton, who was Ms. Wheeler's predecessor at YCHSA, wrote a referral letter to the provider explaining the case history and the reasons for the requested evaluation. Respondent-father also failed to attend this evaluation.

¶ 47 Respondent-father attended the psychological evaluation with Ms. Pulley on 5 November 2019, nearly two years after the target date in his OHFSA and almost three months after YCHSA moved to terminate his parental rights. Ms. Wheeler testified that YCHSA neither referred respondent-father to Ms. Pulley nor wrote a referral letter explaining the reasons for the requested evaluation or the case history. Respondent-father likewise testified that he was referred to Ms. Pulley by Daymark after he unsuccessfully attempted to obtain a psychological evaluation at Daymark in April of 2018.[7] Although Ms. Pulley's report lists "Karen Wheeler" as the person

---

[7] Respondent-father confirmed that Daymark did not have a psychologist on staff at the time he attempted to obtain his psychological evaluation.

who referred respondent-father, Ms. Wheeler testified that she had "spoken to Ms. Pulley about other matters" but did not remember "any conversation referring [respondent-father] for a psychological [evaluation]." The trial court was entitled to credit the respective accounts of Ms. Wheeler and respondent-father instead of a conflicting notation in the document. *See In re T.T.E.*, 372 N.C. at 420.

¶ 48        In disputing the trial court's findings of fact on the matter of his psychological evaluation, respondent-father also cites Ms. Pulley's reference to "Review of Records" as one of the "Assessment Methods" that she used in her evaluation. However, we find nothing in the contents of Ms. Pulley's report to suggest that she was referring to YCHSA records rather than to medical or other records provided by respondent-father. Contrary to respondent-father's claim, Ms. Pulley's report does not state that respondent-father was previously diagnosed with Posttraumatic Stress Disorder (PTSD), a diagnosis that he denies and attributes to inaccurate YCHSA records. Ms. Pulley refers only to a reported "*family history* of depression, anxiety, drug use, and Post-traumatic stress disorder." (Emphasis added.) As respondent-father does not identify any document generated by YCHSA which indicates a family history of PTSD, Ms. Pulley's reference to this background does not operate to establish her access to YCHSA records.

¶ 49        The evidence also supports the trial court's finding that respondent-father was untruthful with Ms. Pulley by failing to disclose his substance abuse history. In the

"Substance Abuse History" section of her report, Ms. Pulley states, "None Reported." Although respondent-father posits that Ms. Pulley's entry "implies third-party reporting sources[,]" the trial court could reasonably infer that Ms. Pulley herself asked respondent-father about his substance abuse history and that respondent-father himself represented that he did not have a history of substance abuse. In light of respondent-father's positive drug screen for amphetamine and methamphetamine on 21 May 2019—months before he attended the psychological evaluation by Ms. Pulley—his failure to disclose any illicit drug use to Ms. Pulley is fairly characterized as untruthful. Respondent-father's challenge to Finding of Fact 37 is overruled.

Respondent-father next contends that the evidence does not support the trial court's statements in Findings of Fact 38 and 52 that he "had not begun any of the therapy or treatments recommended by [Ms.] Pulley" or that he had otherwise "not acted on any of the recommendations from his [psychological] evaluation."[8] We find no merit to his contention.

The evidence shows that Ms. Pulley diagnosed respondent-father with "major depressive disorder, somatic symptom disorder, and general anxiety disorder." She recommended "individual outpatient therapy [and] medication management," as well

---

[8] Although respondent-father does not raise the issue, we note that Finding of Fact 52 erroneously refers to the date that the dispositional hearing concluded—15 June 2020—rather than the 7 February 2020 date of the adjudicatory hearing. We consider this discrepancy to be a mere scrivener's error.

as "[i]nvolvement in small group activities such as volunteer work or sports, . . . to provide an opportunity to practice appropriate social skills and to develop self-esteem."

Ms. Wheeler testified that, to her knowledge, respondent-father had not undertaken any of the treatments recommended by Ms. Pulley, that respondent-father was not currently receiving any mental health treatment, and that respondent-father had made no progress on the mental health component of his OHFSA. Ms. Wheeler specifically "asked [respondents] for verification" of any treatment services and "made them aware that, if they are doing something, participating in treatment or doing something that was [i]n their case plan, that they need to make [her] aware of what they're doing."

Respondent-father testified that he "ha[d] not started any kind of therapy or other curriculum of treatment" based on Ms. Pulley's recommendations, but had obtained "[a] prescription to Zoloft by the VA [hospital]." Although respondent-father argues on appeal that he "was able to enroll in medication management and maintains a prescription for Zoloft," there is no evidence in the record that he enrolled in medication management services as recommended by Ms. Pulley.[9] Moreover, the

---

[9] *See Medication Management*, Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health, Seventh Edition, https://medical-dictionary.thefreedictionary.com/medication+management (last visited Sept. 17, 2021) (defining "medication management" as "a nursing intervention defined as facilitation of safe and effective use of prescription and over-the-counter drugs").

trial court was not required to accept the truthfulness of respondent-father's undocumented testimony about the Zoloft prescription, and the record does not reflect that Ms. Pulley recommended this medication.

¶ 54    To the extent that respondent-father cites his own testimony about "navigat[ing] the VA health system" as a basis for challenging Findings of Fact 38 and 52, his assertions do not impugn the accuracy of the trial court's findings. The evidence demonstrates that respondent-father had not complied with any of Ms. Pulley's treatment recommendations at the time of the termination hearing.

¶ 55    Like respondent-mother, respondent-father also challenges several of the trial court's findings of fact as impermissibly vague. These findings, which refer collectively to respondents, state the following:

> 42.    Neither the Respondent Mother nor the Respondent Father availed themselves of the opportunities and services to obtain permanence and stability for themselves and their children.
>
> 43.    The Respondent Mother and the Respondent Father had the opportunity to correct the conditions that led to the removal of their children from their care, but the parents failed to do so.
>
> 44.    The [c]ourt finds that Respondent Parents' actions were willful.

As with respondent-mother's objection, we find no merit in respondent-father's position.

¶ 56    Findings of Fact 42 through 44 represent the trial court's summary assessment

of respondent-father's actions since the children were placed in YCHSA custody. Those actions are described in detail by Ms. Wheeler in her hearing testimony and in the trial court's Findings of Fact 31 through 42. The "opportunities and services" referenced in Finding of Fact 42 and the "opportunity" referenced in Finding of Fact 43 include the substance abuse assessment and potential treatment offered through Ms. Adams, which YCHSA scheduled and agreed to financially satisfy but which respondent-father failed to complete; the psychological assessments YCHSA scheduled for respondent-father at TriCare with Dr. Sheaffer, which YCHSA also agreed to financially assume; the sessions at the Epilepsy Institute of North Carolina, which respondent-father failed to attend; the subsidized apartment that respondent-father lost in October 2019 by violating the terms of his HUD contract; and the period of more than twenty-seven months afforded to respondent-father to address the issues of mental health, housing, and employment. The willfulness described in Finding of Fact 44 refers to respondent-father's overall lack of progress over this extended period in remedying the conditions that led to the children's removal from the home, as described in Findings of Fact 32 through 40. *See In re J.S.*, 374 N.C. at 815 (stating that a parent's "prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness . . . under section 7B-1111(a)(2)" (quoting *In re J.W.*, 173 N.C. App. 450, 465–66)). Notwithstanding respondent-father's argument on appeal that the trial court erred in failing to specify

"exactly which of the [r]espondent-[f]ather's actions were willful" for purposes of an adjudication under N.C.G.S. § 7B-1111(a)(2), we determine that the trial court's Findings of Fact 42 through 44 were sufficiently couched and were supported by the evidence.

### 2. *Conclusion of law*

¶ 57 Respondent-father argues that the trial court erred by adjudicating grounds to terminate his parental rights under N.C.G.S. § 7B-1111(a)(2) due to his "lack of perfect compliance" with a case plan that he claims was purely "voluntary." Respondent-father represents that he never signed the OHFSA prepared by YCHSA because he objected to certain statements in the document, specifically that he suffered from PTSD, "has a history of abusing drugs[,]" and knowingly "allow[ed] [respondent-mother] to care for the children while under the influence of illegal substances." Respondent-father notes that the trial court never ordered him to complete the OHFSA or to perform any other action in order to regain custody of the children. While acknowledging the trial court's authority to require a parent to "[t]ake appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent," N.C.G.S. § 7B-904(d1)(3) (2019), respondent-father contends that the trial court "abdicated its statutorily defined role to identify the reasons for the [children's] removal and to devise a plan for [respondent-father] to address those

reasons."

¶ 58        As a factual matter, we reject respondent-father's assertion that the trial court did not identify the reasons for the removal of Ben and John from the home or inform respondent-father of the actions that he needed to take to resolve the issues. The trial court's initial order adjudicating the children recounted the facts that established Ben and John as neglected juveniles. Beginning with the ninety-day review order entered on 25 January 2018, the trial court notified respondent-father of its expectations of him and the requirements for reunification with the children as follows:

> 11. [Respondent-father] has refused to enter into an OHFSA with the YCHSA but has orally agreed to undergo a drug assessment, a psychological assessment, and parenting classes. . . .
>
> . . . .
>
> 14. The barriers to reunification include: (1) [respondent-mother] is currently working through the requirements of her OHFSA; (2) [respondent-father] has not entered into an OHFSA with the YCHSA but needs to continue working through the items he orally agreed to complete; (3) the parents need to acquire suitable housing; and (4) one or both parents need to provide proof of an established means to support the minor children.

Subsequently, in three permanency planning orders entered prior to YCHSA's motion to terminate respondents' parental rights, the trial court identified the causes of the children's neglect adjudication as "homelessness, substance abuse, and mental health

issues in the home."

All four of the permanency planning orders entered before the commencement of termination proceedings listed the following requirements of respondent-father's OHFSA and characterized those "requirements [as] aimed at remedying the issues that necessitated the removal of the minor children from the home":

    a.    **Mental Health:** Complete a psychological assessment and complete any of the assessor's recommendations.

    b.    **Substance Abuse:** Complete a substance abuse assessment and complete any of the assessor's recommendations.

    c.    **Drug Screening:** Submit to random drug screens at the YCHSA's request.

    d.    **Parenting Education:** Complete a parenting education program and provide the YCHSA with a certificate of completion.

    e.    **Housing:** Obtain safe and suitable housing that is appropriate for the minor children.

    f.    **Employment:** Obtain stable employment.

The orders also summarized respondent-father's progress in satisfying each component of his OHFSA. Those orders then expressly identified the "barriers to reunification" for each respondent in the same manner as the ninety-day review order. To the extent that respondent-father claims that the trial court "abdicated its statutorily defined role[,]" his argument is refuted by the trial court's orders. *Cf. In re Z.O.G.-I.*, 375 N.C. at 866 (rejecting "respondent's argument that he was never

provided formal guidance on what he was required to do to demonstrate changed conditions" for purposes of N.C.G.S. § 7B-1111(a)(2)).

Respondent-father's testimony at the termination of parental rights hearing confirms that he was aware of and did not object to the requirements of his OHFSA:

> Q. So it's safe to say that your—the reason that you didn't sign this was not based on what they were asking you to do?
>
> A. No, sir. Not at all.
>
> Q. So you knew what they were asking of you and wanted to take part in it?
>
> A. Yes, sir.

Respondent-father further testified that he "never had any hesitation [about] completing the things asked in that document." *Cf. In re B.O.A.*, 372 N.C. at 386 ("[R]espondent-mother voluntarily agreed upon a case plan with DSS and never contended prior to the termination hearing that its components did not address issues that contributed to causing the conditions that led to [the juvenile's] removal from her home.").

We are not persuaded by respondent-father's suggestion that he is somehow exempt from an adjudication under N.C.G.S. § 7B-1111(a)(2) simply because he refused to sign the OHFSA and the trial court did not affirmatively order him to pursue reunification with his children. The statute requires proof of a parent's failure to make "reasonable progress . . . in correcting those conditions which led to the

removal of the juvenile." N.C.G.S. § 7B-1111(a)(2). Such proof was presented in the instant case.

We have held that "parental compliance with a judicially adopted case plan is *relevant* in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2)" provided that "the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home." *In re B.O.A.*, 372 N.C. at 384 (emphasis added). However, compliance or noncompliance with a case plan is not, in and of itself, determinative of a parent's reasonable progress in correcting the conditions that led to a child's removal from the home. *See In re J.S.*, 374 N.C. at 819 (affirming adjudication under N.C.G.S. § 7B-1111(a)(2) when the "respondent had met several conditions of her case plan—completing parenting classes, maintaining regular contact with DSS, attending visitations with the children, passing drug screens, and refraining from illegal activity—but had failed to make meaningful progress in improving the conditions of her home"). The fact that respondent-father refused to sign the OHFSA does not preclude a trial court's assessment of his "progress . . . in correcting those conditions which led to the removal of the [children]." N.C.G.S. § 7B-1111(a)(2).

Finally, the fact that the trial court did not order respondent-father to comply with his OHFSA or otherwise take remedial action does not foreclose a termination

of his parental rights pursuant to N.C.G.S. § 7B-1111(a)(2). Although the trial court is authorized to order certain remedial actions by a juvenile's parent following an adjudication of abuse, neglect, or dependency, the statute does not require the trial court to do so. *See* N.C.G.S. § 7B-904(d1) (providing that "the court *may order* the parent . . . to do any of the following" (emphasis added)).

¶ 64    Section 7B-906.2, which governs the permanency planning process, requires the trial court to

> make written findings as to each of the following, which shall demonstrate the degree of success or failure toward reunification:
>
>> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>>
>> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>>
>> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>>
>> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C.G.S. § 7B-906.2(d) (2019). In each of its permanency planning orders, the trial court made the requisite findings assessing respondent-father's progress under N.C.G.S. § 7B-906.2(d)(1)–(4).

¶ 65    We hold that the trial court's findings of fact support its conclusion of law that respondent-father "willfully left the juveniles in foster care or placement outside the

home for more than twelve months without showing to the satisfaction of the [c]ourt that reasonable progress under the circumstances was made in correcting those conditions which led to the removal of the juveniles" under N.C.G.S. § 7B-1111(a)(2). At the time of the 7 February 2020 adjudicatory hearing, Ben and John had been in an out-of-home placement for more than twenty-six months. Respondent-father had belatedly obtained a psychological evaluation but had yet to pursue the recommended treatment. Regardless of whether he obtained a substance abuse assessment in June 2018, respondent-father had refused his most recent drug screen and had tested positive for both amphetamine and methamphetamine in the preceding drug screen. Although he had completed parenting classes and consistently attended visitations with the children, respondent-father had not made satisfactory progress toward stable employment or housing suitable for the children. Because respondent-father had not meaningfully improved the conditions leading to the children's removal after more than two years, we affirm the trial court's adjudication as sufficiently supported by the evidence contained in the record. *See In re J.S.*, 374 N.C. at 819–21. Having upheld the trial court's adjudication under N.C.G.S. § 7B-1111(a)(2), we do not need to address respondent-father's arguments pertaining to N.C.G.S. § 7B-1111(a)(1). *See In re A.R.A.*, 373 N.C. 190, 194 (2019) ("[A] finding of only one ground is necessary to support a termination of parental rights . . . .").

### III. Conclusion

The trial court's findings of fact are supported by clear, cogent, and convincing evidence, and support its conclusion of law under N.C.G.S. § 7B-1111(a)(2) that respondents willfully failed to make reasonable progress to correct the conditions that led to the removal of the juveniles Ben and John from the home in October 2017. Therefore, the trial court's order terminating the parental rights of respondent-mother and respondent-father is hereby affirmed.

AFFIRMED.