An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-350

Filed 19 November 2025

New Hanover County, No. 17JT000003-640

IN THE MATTER OF: C.S.W.

Appeal by Respondent-Mother from an order entered 30 December 2024 by Judge J.H. Corpening, II in New Hanover County District Court. Heard in the Court of Appeals 30 October 2025.

> *The Law Office of Lisa Noda PLLC, by Lisa M. Noda, for the Respondent-Appellant Mother.*
>
> *Garron T. Michael, for New Hanover County Department of Social Services, Petitioner-Appellee.*
>
> *Administrative Office of the Courts, by NC GAL Staff Counsel Michelle FormyDuval Lynch, for the Guardian ad Litem.*

WOOD, Judge.

Respondent-Mother ("Mother") appeals from the trial court's order terminating her parental rights to her minor daughter. On appeal, Mother argues: (1) the trial court erred in concluding grounds exist to terminate Mother's parental rights based

on willful failure to correct removal conditions and neglect; and, (2) the trial court erred in concluding termination of parental rights is in the child's best interest. For the reasons set forth below, we affirm the trial court's order.

## I. Factual and Procedural Background

On 15 December 2016, Mother gave birth to Chloe.[1] Although Mother identified two putative fathers, neither of them took any action to acknowledge or legitimate Chloe in this case. No father is listed on the birth certificate. The trial court also terminated the parental rights of the unknown father.

Mother has a significant history with New Hanover County Department of Social Services ("DSS"). Since 2016, at least sixteen reports to DSS have been made with concerns about Mother's substance use, mental health, and homelessness. Chloe had been adjudicated neglected and placed in DSS custody twice prior to the last adjudication of neglect.

On 29 September 2022, DSS received a report Mother was struggling with housing instability and had placed Chloe with Miss Greene ("Greene") in June 2022. Mother was living with her boyfriend, Rick Moss ("Moss"). At times Chloe had resided in Moss's home with Mother. Chloe alleged Moss had sexually abused her several times by touching her breasts and putting his penis into her mouth. During its investigation, DSS determined Moss had a June 2000 conviction in South Carolina

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

- 2 -

for sexual conduct with a minor and is listed on the South Carolina Sex Offender Registry as a result of his conviction. He was subsequently charged in North Carolina for the alleged offenses against Chloe.

On 20 November 2022, DSS received a report alleging improper discipline of Chloe and asserting she lived in an injurious environment. The report alleged Mother had cursed at Chloe, threw a shoe at her, and put her hands around her neck and choked her. Mother denied these allegations and threatened to remove Chloe from Greene's care.

On 28 November 2022, DSS learned Chloe had fractured her wrist while in Mother's care. Mother reported Chloe had fallen while playing on cement. DSS requested Mother take a drug screen, but she refused. Mother stated she would not submit to any screenings without a court order and again threatened to take Chloe from Greene's care.

DSS filed a petition alleging in part, Chloe was exposed to a substantial risk of physical injury or sexual abuse because Mother had created conditions likely to cause injury or abuse or had failed to provide, or is unable to provide, adequate supervision or protection.[2] On 8 December 2022, the trial court entered an Order for Nonsecure Custody placing Chloe in DSS custody and allowing placement of her with Greene.

---

[2] We note DSS's petition was not in the record on appeal. However, the trial court found, in its order from 8 December 2022, DSS's allegation of substantial risk to be true.

An adjudication and disposition hearing was held on 18 January 2023. The trial court adjudicated Chloe neglected within the meaning of N.C. Gen. Stat. § 7B-1010(15). At disposition, the trial court continued Chloe in the custody of DSS and ordered Mother to 1) obtain and maintain safe, stable housing; 2) complete a parenting program and demonstrate safe parenting principles; 3) complete a Comprehensive Clinical Assessment ("CCA") and comply with all recommendations to address substance abuse and mental health; 4) submit to random drug screens; 5) meet with social workers once a month; 6) participate in meetings concerning Chloe; and, 7) sign releases of information to allow DSS and the Guardian *ad litem* to communicate with service providers. The trial court allowed placement with Greene and granted Mother supervised visitation with Chloe for a minimum of two hours once per week.

On 12 June 2023, an initial permanency planning hearing was held. The trial court found Mother had secured appropriate housing. She also reported various employment situations, but none were successfully verified by DSS. Mother completed her CCA on 27 February 2023 with diagnoses of bipolar I disorder - mild, phencyclidine use disorder - severe in remission, and cannabis use disorder - moderate. Treatment recommendations included outpatient therapy, medication management, employment services, and peer support services. Mother had not completed any of the recommended services at the time of the hearing, but she had completed the Triple P Parenting Program on 20 March 2023. Since the previous

hearing DSS had requested seven drug screenings. Mother only complied with one screening, and her urine was noted to be diluted but tested positive for cocaine metabolite. Mother attended visitation regularly, although she was consistently late. She also suggested two potential visitation supervisors in order to have visits outside the department. However, one of the supervisors suggested was male and Chloe had made it clear she does not feel safe with adult males. Mother also suggested a great maternal aunt in California as a placement option. DSS initiated a home study through the Interstate Compact for the Placement of Children, but no response was received at the time of the hearing.

The trial court determined Mother was not making adequate progress on her plan and ordered a concurrent plan of legal custody with a court-approved caretaker as well as reunification. Mother's previous plan for reunification as set forth by the trial court was continued.

Another permanency planning hearing was held on 16 November 2023. DSS reported that Chloe was displaying significant anxiety on visitation days and had received one three-day suspension from school for physical aggression. Greene noted an increase in bed-wetting following visits with Mother. Mother was significantly behind in rent and facing eviction from her apartment. No employment could be confirmed for Mother. Mother began outpatient therapy at A Helping Hand and was recommended for a higher level of care. She enrolled in the recommended program on 28 June 2023 and attended six sessions but failed to complete the program. She

sought inpatient treatment at A Healing Place on 17 August 2023 but left after four days. She reported receiving medication management through Physicians Alliance, but DSS could not confirm this. DSS had requested fifteen drug screens since the last hearing, but Mother only complied with four of the fifteen drug screen requests. Each of the four drug screens tested positive for cocaine and benzoylecgonine.

On 5 October 2023, Mother admitted she had relapsed. Mother continued to visit with Chloe regularly but had some difficulty accepting and implementing feedback and once had a melt down during visitation after which she tested positive for a high level of cocaine. The trial court changed Chloe's primary plan to adoption based on Mother's limited and inconsistent progress.

On 7 March 2024, DSS filed a petition seeking to terminate the parental rights of Mother and any putative father. DSS alleged Mother neglected Chloe under N.C. Gen. Stat. § 7B-1111(a)(1) and willfully left her in foster care or other placement outside the home for over twelve months under N.C. Gen. Stat. § 7B-1111(a)(2).

On 12 August 2024, the trial court conducted a hearing on the termination of parental rights petitions. Jennifer Avery, a licensed clinical mental health counselor, testified concerning Mother's previous CCA from 27 February 2023.

Matthew Mitchell ("Mitchell"), a licensed clinical social worker at Coastal Horizon Center, testified concerning an updated CCA from 22 May 2024. He stated Mother was seeking support with opioid withdrawal. Mother was exhibiting withdrawal symptoms including flu-like symptoms, shaking, sweating with rapid and

pressured thoughts. She reported taking cocaine and "pressed pills" which were most likely a blend of fentanyl and other drugs. The goal in assessing Mother was to stabilize her withdrawal and get her into the daily dosing program. However, Mother left after her assessment and never returned or responded to the multiple outreach attempts made by the center.

Constance Chavis ("Chavis"), the previous social worker with New Hanover County DSS testified about the history of Chloe's case. She reported she had served as Chloe's case worker since the underlying action was filed in December of 2022 until 10 June 2024. She testified that Mother signed the first family service agreement on 13 January 2023 to address issues with mental health, housing, substance use and parenting. Mother was initially proactive completing Triple P Parenting classes by 20 March 2023. She also received assistance through a housing program beginning in March of 2023 and was able to acquire housing. Chavis noted Mother had gone through a variety of jobs since the case started and was currently working through Express Temporary Services, a temp agency. She also reported that Mother did not start substance abuse treatment until June 2023, six months after signing the agreement. Additionally, Chavis testified, of the thirty drug screenings DSS requested Mother complied with nine and tested positive for cocaine metabolites on all nine drug screens. She had also tested positive for Fentanyl in December 2023.

Chavis also testified concerning Chloe's current placement with a foster family. Chloe had previously been placed in a kinship placement with Greene. However, in

December 2023, Chloe reported to school personnel that two of Greene's adult grandchildren had harmed her physically. She then recanted the story going back and forth about what happened. Consequently, she was asked to leave the home. Chavis reported Chloe has been in four different foster homes since leaving Greene. However, Greene has now completed the process to become a licensed foster care provider in Pender County and feels she could meet Chloe's needs. Chavis also reported there were two relatives who have expressed interest in placement.

Katie Bell ("Bell"), the current social worker with New Hanover County DSS testified concerning the most recent events in Chloe's case. She testified Mother was currently attending outpatient drug treatment sessions, but she had refused three out of four requested drug screens. The one drug screen she completed tested positive for cocaine. Bell also reported Mother lost her housing for failure to pay rent and moved in with a fiancé. DSS conducted a background check on Mother's new fiancé and found that he has a significant criminal history with a pattern of charges, but no convictions, for assaults on females, most recently in 2023. As well as drug convictions from the early 2000's and a DWI in 2016. Mother also had recently asked for help with admission to an inpatient treatment facility, and DSS provided the information necessary for Mother to move forward if she desired to do so.

Stephanie Sturgess ("Sturgess"), a therapist with the outpatient substance abuse program at A Helping Hand of Wilmington testified about her knowledge of drug treatment as well as her interactions with Mother. Sturgess testified that one

cycle of the program generally takes 32 to 40 sessions, and the program meets three times per week. Sturgess noted that Mother had come in and out of the program for years as she "flip flopped" between agencies. Most recently, Mother had completed an intake assessment on 29 May 2024, left for approximately a month and then came back on 24 June 2024. Since June she had been attending sessions more consistently, although she had missed some. Sturgess reported Mother had recently completed three drug screens through the program. Two were positive for cocaine and on 7 August she was positive for cocaine and PCP. Sturgess testified she has made several recommendations for Mother to engage in an inpatient or residential long-term program because she thinks that level of care is most appropriate for Mother, but Mother has indicated to her that she is not interested and does not want to go. Sturgess stated that Mother's relationship with Chloe is a "twisted logic" and "co-dependent type thing" where she is motivated to get clean for her, but when she does not have her there is little reason to be clean.

Mother also testified. She testified she had lied about taking Fentanyl because she was told Coastal could help with medication management for addiction cravings but only if she was on an opioid. However, when she took her first dose of suboxone from the clinic it made her violently sick for two days, so she never returned. She acknowledged she was still using cocaine, as recently as three days prior to the hearing, but denied any recent PCP use. She admitted she did not attend outpatient

treatment like she should. She also testified that she just got a new part-time job at WAVE Transit in customer service and picks up temp work when she can.

Mother also testified she believed that Chloe was assaulted by her previous boyfriend and that is why it took a long time to introduce her to her new fiancé. Mother reported she was aware of her fiancé's criminal history but testified that he had never been violent with her and does not do drugs. Mother testified she recognizes she cannot be a good parent while abusing drugs and she has not been able to sustain sobriety. She testified it was important to her that Chloe be with someone in her family and maintain those connections with her family and her culture.

The trial court found DSS met its burden to prove grounds existed to terminate parental rights for neglect and willful failure to correct removal conditions. The trial court then proceeded to disposition and heard testimony concerning Chloe's best interests.

According to Chavis, after Chloe's placement with Greene was disrupted, Chloe began displaying a significant increase in concerning behaviors including yelling, breaking items, bed wetting, hitting other children at school and attempting to stab another child at school with a pencil. DSS referred her for a CCA and moved her into a therapeutic home placement. Her foster family started taking her to therapy services. Although Mother had previously provided two names of family members that could potentially take Chloe, those family members told Chavis they could not

provide that level of care at this time. Chavis reported there are two other family members from Georgia interested in taking Chloe, and Greene has also expressed interest in having her return. In addition, Chloe's current placement has indicated they would like to become a permanent placement. Finally, Chavis testified that Chloe is well aware of Mother's substance abuse issues and is afraid of Mother's previous boyfriend, but she does have a strong loving attachment to Mother.

The guardian *ad litem* provided a report which the trial court received as evidence of best interest.

At the end of disposition testimony, the trial court determined it was in Chloe's best interest to terminate the parental rights of Mother and any putative fathers. Additionally, the trial court ordered home assessments for the two relatives in Georgia and scheduled a permanency planning hearing for 16 October 2024. The trial court's order was filed 30 December 2024. Mother filed notice of appeal 10 January 2025 for both the adjudication and disposition orders.

## II.  Analysis

On appeal Mother argues: (1) the trial court erred in concluding that grounds had been proven to terminate Mother's parental rights based on a willful failure to correct removal conditions and neglect; and (2) the trial court erred in concluding that termination of parental rights was in the child's best interest. For the reasons set forth below, we affirm the trial court's order.

### A. Grounds for Termination

Mother contends the trial court erred by finding grounds exist to terminate her parental rights based on a willful failure to correct the conditions which lead to removal and neglect. We disagree.

"The termination of a parent's parental rights in a juvenile matter is a two-stage process consisting of an adjudicatory stage and a dispositional stage." *In re C.B.*, 375 N.C. 556, 559, 850 S.E.2d 324, 327 (2020). At the adjudicatory stage, "[t]he standard of review in termination of parental rights cases is whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law." *In re C.M.P.*, 254 N.C. App. 647, 654, 803 S.E.2d 853, 858 (2017) (quoting *In re Shepard*, 162 N.C.App. 215, 221–22, 591 S.E.2d 1, 6 (2004)). When findings of fact "are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary." *In re S.C.R.*, 198 N.C. App. 525, 531, 679 S.E.2d 905, 909 (2009) (quoting *In re Williamson*, 91 N.C.App. 668, 674, 373 S.E.2d 317, 320 (1988)). "Additionally, the trial court's findings of fact to which an appellant does not assign error are conclusive on appeal and binding on this Court." *Id.* "The trial court's conclusions of law are reviewed *de novo*." *In re S.I.D.-M.*, 288 N.C. App. 154, 162, 885 S.E.2d 344, 350 (2023).

The trial court concluded grounds exist to terminate Mother's parental rights based on a willful failure to correct removal conditions and for neglect under N.C. Gen. Stat. §§ 7B-1111(a)(2) and (a)(1).

- 12 -

**1. Willful Failure to Correct Removal Conditions**

Pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) a court may terminate parental rights upon a determination that the parent has

> willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.

N.C. Gen. Stat. § 7B-1111(a)(2). It is undisputed Chloe had been "in placement outside the home for over twelve months." In fact, this matter commenced when she was removed from Mother's care for the *third* time on 8 December 2022. By the time the termination hearing was held on 12 August 2024, more than twenty-one months had passed since the last removal.

"[W]illfulness is not precluded just because respondent has made some efforts to regain custody of the child." *In re Oghenekevebe*, 123 N.C. App. 434, 440, 473 S.E.2d 393, 398 (1996). "Willfulness may be found where a parent has made some attempt to regain custody of the child but has failed to exhibit 'reasonable progress or a positive response toward the diligent efforts of DSS.'" *In re J.W.*, 173 N.C. App. 450, 465, 619 S.E.2d 534, 545 (2005) (quoting *In re B.S.D.S.*, 163 N.C. App. 540, 545, 594 S.E.2d 89, 93 (2004)). Similarly, "a respondent's prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness

regardless of her good intentions, and will support a finding of lack of progress . . . sufficient to warrant termination of parental rights under section 7B-1111(a)(2)." *In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d 66, 71 (2020) (cleaned up). Noncompliance with the case plan can support a finding of lack of reasonable progress when there is a "nexus between the components of the court-approved case plan with which [the respondent] failed to comply and the 'conditions which led to [the child's] removal' from the parental home." *In re J.S.*, 374 N.C. 811, 816, 845 S.E.2d 66, 71 (2020) (quoting *In re B.O.A.*, 372 N.C. 372, 385, 831 S.E.2d 305, 314 (2019)).

Mother entered into an initial family service case plan on 13 January 2023. It required Mother to complete a CCA and comply with any and all treatment recommendations to address her substance abuse and mental health needs, to submit to random drug screens, to attend parenting classes, demonstrate safe parenting, obtain and maintain safe housing, meet with social workers once a month, participate in meetings concerning Chloe, and sign releases of information to allow DSS and the Guardian *ad litem* to communicate with service providers.

It is evident and the trial court found Mother loves her daughter. She prioritized time with Chloe by attending the vast majority of her weekly visits. She completed the recommended Triple P Parenting classes on 20 March 2023 and demonstrated attempts to utilize these skills during visitation. However, Mother did not demonstrate adequate progress toward the other portions of her case plan.

Mother initially completed a CCA on 27 February 2023, stating she had

previously used PCP but was currently only using marijuana. This statement was not consistent with Mother's positive drug test for cocaine on 8 February 2023.

Following the completion of the initial CCA, Mother did not engage in any recommended drug or mental health services until June 2023. In June 2023, Mother initiated, but did not successfully complete, an intensive outpatient program for substance abuse.

On 22 May 2024, Mother completed an updated CCA at Coastal Horizons. During the assessment Mother admitted to taking "pressed pills" or fentanyl in addition to cocaine; however, she did not test positive for opiates. She was given initial treatment but never returned to Coastal Horizons and later testified she lied about the pills in order to access medication management through their program.

Of approximately thirty-five DSS drug screen requests, Mother submitted to ten, of which all were positive for illegal substances. She consistently tested positive for cocaine and occasionally tested positive for fentanyl and PCP. Most recently, on 7 August 2024, Mother tested positive for cocaine and PCP. However, during the 12 August 2024 termination of parental rights hearing, Mother told the trial court that she had used cocaine as recently as three days ago, but denied she had any recent PCP use, stating that PCP has not been a factor in her life for years, she is not aware of testing positive for it, and she is not seeking help for PCP use.

Sturgess, the drug treatment provider who had worked on and off with Mother for years, testified she had not observed Mother make behavioral changes and

reported Mother does not accept her addiction and has not applied the skills she has learned in treatment. Mother never successfully completed a drug or mental health treatment program and was still actively engaging in substance abuse at the time of the termination hearing.

Additionally, Mother recently lost her housing, and her employment has been inconsistent. Because of her employment issues, Mother fell behind on the rent for the apartment she had secured with help from DSS and was evicted in July 2024. Mother moved in with her fiancé, although she is aware that he has a criminal history including multiple charges for assault on a female as recent as 2023, drug charges and a DWI conviction.

Chloe came into care the third time, in part, because Mother had her lost housing and had moved in with a boyfriend with a significant criminal history who was charged with sexually assaulting Chloe. DSS notes continued concerns for Chloe's physical safety due to Mother's erratic behavior and her refusal to submit to drug tests. Mother has demonstrated this reoccurring pattern throughout Chloe's young life and once again resides with a romantic partner, who has a significant criminal history and continues to refuse drug tests. A very clear nexus exists between Mother's noncompliance with critical elements of her case plan and the conditions which led to Chloe's third removal.

A Mother's love and good intentions in completing parenting classes and continuing visitation cannot outweigh or be said to meet the threshold of making

reasonable progress where failure to complete any mental health or drug treatment program, ongoing substance abuse, and a lack of safe housing demonstrates a willful failure to make reasonable progress toward correcting the issues precipitating the removal of the child. The trial court did not err in its determination DSS had presented clear, cogent, and convincing evidence to prove grounds exist to terminate Mother's parental rights based on a willful failure to correct removal conditions under N.C. Gen. Stat. § 7B-1111(a)(2).

2. Neglect

"[A]n adjudication of any single ground for terminating a parent's rights under N.C. [Gen. Stat.] § 7B-1111(a) will suffice to support a termination order. Therefore, if this Court upholds the trial court's order in which it concludes a particular ground for termination exists, then we need not review any remaining grounds." *In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d 66, 71 (2020) (cleaned up). Because we hold that the trial court properly adjudicated a ground for termination under N.C. Gen. Stat. § 7B-1111(a)(2), we need not address Mother's arguments regarding neglect under N.C. Gen. Stat. § 7B-1111(a)(1).

**B. Best Interests**

"The trial court's assessment of a juvenile's best interest at the dispositional stage is reviewed only for abuse of discretion." *In re Z.A.M.*, 374 N.C. 88, 95, 839 S.E.2d 792, 797 (2020) (quoting *In re Z.L.W.*, 372 N.C. 432, 435, 831 S.E.2d 62, 64 (2019)). "Under this standard, we defer to the trial court's decision unless it is

'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.'" *Id*. at 100, 839 S.E.2d at 800 (quoting *Briley v. Farabow*, 348 N.C. 537, 547, 501 S.E.2d 649, 656 (1998)).

Mother contends the trial court abused its discretion by terminating Mother's parental rights without adequately considering the strong bond Chloe has with her family. We disagree.

> At the dispositional stage the trial court must "determine whether terminating the parent's rights is in the juvenile's best interest" based on the following criteria:
>
> (1) The age of the juvenile.
> (2) The likelihood of adoption of the juvenile.
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
> (4) The bond between the juvenile and the parent.
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
> (6) Any relevant consideration.

*In re Z.A.M.*, 374 N.C. 88, 99, 839 S.E.2d 792, 799 (2020) (quoting N.C. Gen. Stat. § 7B-1110(a) (2019)). The trial court must consider all the relevant factors and make written findings concerning those factors that are relevant or contested. *Id.* Mother does not contest any of the trial court's findings of fact, solely the conclusion of law that "[i]t is in the best interest of the Juvenile . . . that that parental rights of Respondent-Mother . . . to the Juvenile be terminated." Therefore, those findings are binding on appeal. *In re S.C.R.*, 198 N.C. App. 525, 532, 679 S.E.2d 905, 909 (2009).

The trial court made numerous findings of fact in line with N.C. Gen. Stat. § 7B-1110(a):

> 63. The juvenile is 7 years old . . . .
>
> 64. The juvenile has had multiple placements and placement disruptions since leaving miss Green's home. She continues to struggle with such behaviors as yelling, acting out, being disrespectful, being aggressive with peers and bed-wetting. A Comprehensive Clinical Assessment (CCA) was completed in February 16, 2024, to assess what level of services is required to meet her needs. In March 2024, a higher level of care was recommended, and an addendum to the CCA was prepared March 12, 2024. The CCA and Addendum were admitted into evidence without objection as *Petitioner's Exhibits "5"* and *"6"*, respectively and were considered by the Court on the issue of best interests. The CCA and Addendum are incorporated by reference as it fully set forth herein.
>
> 65. [] Greene has recently indicated a renewed interest in having the Juvenile placed back in her home. She is now a licensed foster parent through Pender County.
>
> 66. Respondent-Mother previously requested that her aunt [] who lives in California, be considered for placement of the Juvenile. A home study request was made through the Interstate Compact for the Placement of Children (ICPC), but the placement was denied as [Aunt] had developed health concerns that would not allow her to provide care for the Juvenile.
>
> 67. [Other] Maternal relatives [] were previously contacted at the request of Respondent-Mother. Each was only willing to assist on a temporary basis, and neither was interested in providing a permanent placement for the Juvenile.
>
> 68. Maternal relatives [] both of whom reside in Georgia, are interested in placement of the Juvenile . . . . It will be

necessary for an ICPS home study request to be made to assess [them] for potential placement of the Juvenile. Social Workers Chavis testified that [Chloe] knows her family, and it's very important to maintain contact with family.

69. The Juvenile has been in her current placement since the end of May 2024; she was previously in respite care with this foster family and was excited to return to their household. The foster parents have been strong advocates in getting additional services in place for [Chloe], including school-based therapy and counseling through the Carousel Center, and are interested in providing permanence for her.

70. There is a strong likelihood that the Juvenile will be adopted.

71. Adoption remains the best permanent plan for the Juvenile, and termination of parental rights of Respondent-Mother, Respondent-Putative Father Davis and any unknown biological father of the Juvenile will aid in accomplishing that plan.

72. The Juvenile has a strong bond with Respondent-Mother.

73. The Juvenile has no bond whatsoever with Respondent-Putative Father Davis or with any unknown biological father.

74. It is in the best interest of the Juvenile that parental rights of Respondent-Mother, Respondent-Putative Father Davis and any unknown biological father of the Juvenile be terminated.

75. Termination of parental rights of each Respondent and of any unknown biological father will aid in achieving the permanent plan of adoption of the Juvenile.

These thirteen findings of fact address all six necessary statutory factors including Chloe's relationships with her mother and the other family members to whom Mother has reached out throughout the pendency of this case. The trial court acknowledged Chloe's attachment to her Mother noting, "I know you love her" but "I'm doing what I feel like I gotta do today. . . . So [Chloe] has got to have more. . . . Love is not enough." Our Supreme Court has noted, "the bond between parent and child is just one of the factors to be considered under N.C. [Gen. Stat.] § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re J.J.B.*, 374 N.C. 787, 795, 845 S.E.2d 1, 6 (2020) (quoting *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 66 (2019)). Such is the circumstance here.

The trial court explicitly recognized Chloe's bond with Mother in finding of fact 71 but assigned greater weight to Chloe's need for and likelihood of permanent stability through adoption. The trial court clearly stated,

> we know that in the absence of that safe and caring and stable and loving home with the relationships that her life expectancy could be 20 years shorter already. That's the magnitude of what we're talking about. We know that her -- the possibility of any number of adult diseases has been ramped up significantly for her even now because of changes in her brain and body that have happened as a result of the trauma that she's experienced since she was three weeks old. It's almost like a recurring nightmare for her.

The trial court recognized the importance of keeping family in Chloe's life. The trial court noted in finding 68, "Social Worker Chavis testified that [Chloe] knows her

family, and it's very important to maintain contact with family" and went on to order an ICPC home study for maternal relatives to determine if they could provide permanent placement or guardianship for Chloe.

Because the trial court clearly considered the strong bond Chloe has with Mother and her extended family, as well as all other necessary statutory factors under N.C. Gen. Stat. § 7B-1110(a), we conclude the trial court did not abuse its discretion when determining that termination of Mother's parental rights was in Chloe's best interest.

## III.    Conclusion

Based on a thorough review of the record, we conclude the trial court properly adjudicated a ground for termination of Mother's parental rights existed under N.C. Gen. Stat. § 7B-1111(a)(2) and did not abuse its discretion when determining that termination of Mother's parental rights was in Chloe's best interest.  We affirm the trial court's order terminating Mother's parental rights to Chloe.

AFFIRMED

Judges Tyson and Freeman concur.

Report per Rule 30(e).